## A08A2043. WELLS v. THE STATE.
### (676 SE2d 821)

PHIPPS, Judge.

In connection with a single-car crash that caused severe injury to the left eye of passenger William Dennis, Roosevelt Wells was charged with and found guilty of numerous offenses. After some of the counts were merged for sentencing purposes, Wells was convicted of improper lane change; serious injury by vehicle, while DUI per se; and misdemeanor obstruction of an officer. On appeal, Wells contests the sufficiency of the evidence, the admission of statements he made the day of the incident, the trial court's refusal to remove for cause a prospective juror, the trial court's ruling on an objection to the defense closing argument, and the trial court's communication with the jury outside his and his attorney's presence. Wells has demonstrated merit in his contention that the trial court impermissibly communicated with the jury. Accordingly, his convictions must be reversed. As the evidence was sufficient as to each charged offense,[1]

---

[1] See Division 1, infra.

Wells may be retried.[2]

1. When an appellant challenges the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[3] "The appellant no longer enjoys the presumption of innocence."[4] The jury, not this court, resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from the evidence.[5] "As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld."[6]

So viewed, the evidence showed that at about 3:00 p.m. on September 27, 2004, loud crashing sounds drew the attention of several individuals. They rushed toward the source of the noise to investigate and found an overturned car with two men trapped inside. At the time, it was raining heavily.

The man in the passenger side of the car was Dennis; his left eye had been forced out of its socket. There was a tremendous amount of blood in the passenger area around him. Onlookers noticed an odor of alcoholic beverage emanating from the vehicle. Wells, in the driver's side of the car, was squirming from behind the steering wheel and screaming with profanity for those outside the car to help him get out. Wells soon smashed the driver's side window, crawled out of the car, and asked several of the approximately eight to ten bystanders to take him away from the scene. They refused; emergency help had been summoned; and within five or ten minutes of the crash, a police officer arrived.

The two persons who had arrived first at the wrecked vehicle told the officer that Wells had been the driver. Wells was standing among the gathered individuals, and when the officer asked Wells what had happened, he denied any involvement with the collision. Wells told the officer that he had been walking down the street, and the car struck him before it flipped onto its top. Wells thereafter admitted that he had been in the car when it wrecked, but claimed he had been the passenger. Wells's account changed as the officer commented on conflicts between his versions and reports by other individuals standing in the area.

The officer, having come within three feet of Wells, had detected

---

[2] See *Lively v. State*, 262 Ga. 510, 512 (3) (421 SE2d 528) (1992).

[3] *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979) (citation and emphasis omitted).

[4] *Walker v. State*, 282 Ga. 406 (651 SE2d 12) (2007).

[5] *Jackson*, supra; *Walker*, supra.

[6] *Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001) (citation omitted).

a strong odor of alcoholic beverage coming from him. The officer told Wells to remain at the scene during the ongoing investigation, but Wells attempted to walk away several times. To prevent Wells from doing so, the officer handcuffed Wells and forced him into the back of his patrol car. While placing Wells in the patrol car, the officer noted Wells's obvious limp.

A second police officer, a trained accident investigator, responded to the scene. By then, medical personnel were providing care to Dennis, who was still in the car. The investigator was briefed that the person in the back seat of the patrol car had been the driver of the upside-down car and had tried to leave. He leaned into the patrol car and asked Wells for his identification. When Wells responded, the investigator detected the odor of alcohol emanating from either Wells's breath or his person. After examining the scene, the investigator sat in the patrol car with Wells to get out of the rain to record his observations of the scene. In response to no questioning, Wells made numerous outbursts, including adamant claims that while he may have consumed alcohol, he had not been the driver of the damaged vehicle, and an assertion that he possessed a wheelchair in the car's trunk, which would prove his denial of having been the driver. The officer described Wells as being very agitated.

Having heard Wells complain of an injured leg, the investigator administered no field sobriety tests. He did, however, seek Wells's consent for a chemical test of his breath. After being advised of his implied consent rights, Wells submitted to testing on an Intoxilyzer 5000 at 5:09 p.m. The testing yielded results of 0.096 and 0.098. The investigator opined at trial that, in light of the test results, together with his observations of Wells and of the scene, Wells had been DUI less safe.

The officer transported Wells to jail. After the two entered the building, an intake officer asked Wells why he was there. The officer who was escorting Wells at the time described at trial Wells's response: "He essentially stated something along the lines of I was trying to operate my vehicle with my bad leg after I'd been drinking and I had a wreck."[7]

The day after the incident underlying this case, when the rain stopped, the officer trained in accident investigation returned to the collision scene to resume his investigation. The officer examined and marked what he determined were skid marks and scrapes from the wreck the day before. He explained his findings at trial, including loosely defining skid marks as "where you lock a tire up and it leaves

---

[7] We conclude in Division 3 (c), infra, that Wells's response was inadmissible to prove his guilt. But even without this response, the evidence was sufficient as to each count.

156

black marks." And photographs the investigator took at the scene were shown to the jury. The officer pointed out that the skid marks and scrapes ran from the road, across a curb, into grass, and ended near a tree, which was broken apparently where the car had struck it. Based upon his two-day investigation of the site, the officer concluded that Wells's car was traveling in its lane; the brakes were applied; the car began to skid; and it left the roadway, crossed an adjacent grassy area, struck a tree, overturned, and landed on its roof.

Wells, the sole defense witness, gave an account of the events that led to the collision that extremely rainy day. Initially, Dennis had been driving because Wells had an injured knee and had taken Vicodin medication earlier that day to relieve associated pain. He and Dennis stopped and purchased a pint of vodka, which they consumed together within about 30 minutes. It began to rain more heavily, and they switched seats because Dennis did not feel capable of driving in such conditions. Wells recalled that the dashboard brake light began flashing and eventually remained illuminated. Wells recounted that, within 20 minutes after he began driving, "all of a sudden the brakes went out. Dennis panicked, he grabs the steering wheel. The car end up on two wheels. It hit the sidewalk, flips over, we hit the tree, both of us end up unconscious." Wells recalled being awakened by onlookers banging on the car, warning him to hurry out of the car because it might explode. And in response, he screamed for them to help him out of the car.

Wells asserted at trial that his alcohol consumption had played no part in the wreck. He denied telling any officer that he had not been involved in the wreck. On cross-examination, Wells admitted that the brakes had caused no problem when he and Dennis stopped at the liquor store or when they stopped to switch seats. He recounted that when he pressed the brake pedal that final time, the pedal collapsed to the floor, and the wheels continued to rotate.

(a) Sufficient evidence authorized the jury's findings of guilty on all six counts of the indictment: improper lane change;[8] DUI per se;[9] serious injury by motor vehicle, having caused bodily harm to Dennis by rendering his left eye useless, by operating a motor vehicle while DUI per se;[10] DUI less safe;[11] serious injury by motor vehicle, committed by causing bodily harm to Dennis by rendering his left

[8] OCGA § 40-6-123 (a).

[9] OCGA § 40-6-391 (a) (5); see *Partridge v. State*, 266 Ga. App. 305, 306 (596 SE2d 778) (2004).

[10] OCGA § 40-6-394; see *Jones v. State*, 195 Ga. App. 569-570 (1) (394 SE2d 387) (1990).

[11] OCGA § 40-6-391 (a) (1); see *Schlanger v. State*, 290 Ga. App. 407, 415 (7) (c) (659 SE2d 823) (2008).

eye useless, while DUI less safe;[12] and obstruction of a law enforcement officer, by misleading the first police officer to respond to the scene about who had been driving a vehicle involved in a collision.[13]

(b) We turn to Wells's specific challenges to the sufficiency of the evidence. First, Wells argues that the state failed to disprove his affirmative defense of accident as to the counts of improper lane change; DUI less safe; and serious injury by vehicle, while DUI less safe. He cites his testimony that the automobile left the road and crashed because· of the bad weather and a brake malfunction, coupled with Dennis's action of grabbing the steering wheel. Wells claims that his account of how the car left its lane and wrecked was undisputed. He further asserts that the state's case was fraught with evidentiary weaknesses, pointing out that the state produced no eyewitness to the car crash itself; that neither police officer observed skid marks on the day of the incident (which the officers testified was due to the heavy rainfall and the amount of water covering the roadway); and that the investigator had the damaged vehicle towed that day, but admittedly conducted no investigation thereafter on the vehicle's brakes, tires, or dashboard functioning. Moreover, according to Wells, the state's case was circumstantial and failed to satisfy OCGA § 24-4-6.[14]

"When a defendant raises an affirmative defense and offers evidence in support thereof, the State has the burden of disproving that defense beyond a reasonable doubt."[15] However, a jury is not required to believe a defendant's testimony, nor to disbelieve the state's witnesses.[16] Even where the case is based upon circumstantial evidence, "it is not necessary that the circumstantial evidence exclude every other hypothesis except that of guilt, but only reasonable inferences and hypotheses."[17]

> Furthermore, where the defendant offers an explanation of circumstantial facts or an alternative hypothesis of events, the reasonableness of that explanation is for the factfinder. Because the factfinder has heard the witnesses and observed them testify, it is considered more capable of deter-

---

[12] OCGA § 40-6-394; see *Gentry v. State*, 236 Ga. App. 820, 822 (1) (513 SE2d 528) (1999).

[13] OCGA § 16-10-24 (a); see *Duke v. State*, 205 Ga. App. 689, 690 (423 SE2d 427) (1992).

[14] "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."

[15] *Bishop v. State*, 271 Ga. 291 (2) (519 SE2d 206) (1999).

[16] See *Boyd v. State*, 291 Ga. App. 528, 530 (662 SE2d 295) (2008).

[17] *Pecina v. State*, 274 Ga. 416, 419 (2) (554 SE2d 167) (2001) (citation and punctuation omitted).

158

mining the reasonableness of the hypothesis produced by the evidence or lack thereof than is an appellate court.[18]

In this case, the jury was authorized to find that the state had disproved Wells's affirmative defense as to the cited counts.[19]

(c) Wells argues that the jury found him guilty of obstruction based solely upon incompetent evidence. Wells complains that the trial court erred by allowing in evidence his statements to the first responding officer about who had been driving the vehicle. He claims that, without such statements, the evidence was insufficient to support a guilty verdict on that count. We have reviewed the trial court's denial of Wells's suppression motion, also enumerated by Wells as error, and have found no error.[20] Consequently, there is no merit in his argument that the guilty verdict upon the obstruction count was based solely upon incompetent evidence.

(d) Wells argues that the state failed to prove the serious injury by vehicle counts because Dennis's eye injury did not rise to the level of severity necessary to constitute a violation of OCGA § 40-6-394. However, evidence that Dennis's eye had been forced out of its socket was sufficient to show that a "member of his body [had been rendered] useless."[21]

2. Wells contends that, by communicating with the jury outside his and his lawyer's presence, the trial court violated his constitutional right to be present at all stages of the proceedings.

After being informed that the jury had reached its verdict, but before bringing in the jury, the court summoned to the courtroom the prosecuting and defense attorneys (and apparently Wells) for the express purpose of announcing on the record:

This Court received a communication from the jury that they had reached a unanimous decision on three counts and that they were 11 to one on the other three, please advise. I sent them a written instruction to continue to deliberate and try to reach a unanimous verdict. I then got another written communication from them that says, may we have access to the defendant's testimony, paren, transcript. I just discussed that off the record with both attorneys and how I was proposing to answer that to the jury, and before we

---

[18] *Boyd*, supra (footnote omitted).

[19] See *Pecina*, supra; *Gentry*, supra; Division 1 (a), supra.

[20] See Division 3 (a), infra.

[21] OCGA § 40-6-394; see *Adams v. State*, 259 Ga. App. 570, 571 (1) (578 SE2d 207) (2003) (to constitute the crime of serious injury by vehicle, there is no requirement that, in addition to being serious, the member of the victim be permanently rendered useless).

could bring them in, the bailiffs have just now informed me that we have a verdict. So I don't think there's any need in answering this question. They seem to have resolved it themselves.[22]

Defense counsel voiced objection to the trial court's action regarding the first note. Wells maintains on appeal that he was denied a fair trial, asserting that the court's instruction was impermissibly coercive in that a juror stood alone in voting, likely against his conviction on three counts.

In *Lowery v. State*,[23] the Supreme Court of Georgia reiterated:

Within the Georgia constitutional right to the courts embodied in Article I, Section I, Paragraph XII of the Georgia Constitution is a criminal defendant's right to be present, and see and hear, all the proceedings which are had against him on the trial before the Court. A trial court's communication with a jury on substantive matters is a part of the proceedings to which the defendant and counsel are entitled to be present.[24]

In *Huff v. State*,[25] the Court explained:

The right to be present attaches at any stage of a criminal proceeding that is critical to its outcome if the defendant's presence would contribute to the fairness of the procedure. . . . [A] critical stage in a criminal prosecution is one in which a defendant's rights may be lost, defenses waived, privileges claimed or waived, or one in which the outcome of the case is substantially affected in some other way.[26]

In *Hanifa v. State*,[27] the Court instructed:

Unquestionably the trial judge should not in any manner communicate with the jury about the case, in the absence of the accused and his counsel, pending the trial; and the better practice is for the judge to have no communication

---

[22] The record before us does not contain the notes.

[23] 282 Ga. 68 (646 SE2d 67) (2007).

[24] Id. at 73 (4) (b) (citations, punctuation and emphasis omitted); see *Hanifa v. State*, 269 Ga. 797, 807 (6) (505 SE2d 731) (1998) (colloquy between the trial judge and the jury is a part of the proceedings to which the defendant and counsel are entitled to be present).

[25] 274 Ga. 110 (549 SE2d 370) (2001).

[26] Id. at 111 (2) (citations and punctuation omitted).

[27] Supra.

with the jury on any subject except through the medium of the sworn bailiff in charge of the jury; and the communication should be restricted, in the absence of the accused and his counsel, to matters relating to the comfort and convenience of the jury. There should be no communication which would tend in any manner to prejudice the accused; and unless the character of the communication clearly shows that it could not have been prejudicial to the accused, the presumption of law would be that it was prejudicial.[28]

The trial court's communication at issue in this case was not "relating to the comfort and convenience of the jury," but was instructive to the jurors who sought guidance in light of their inability to reach unanimous decisions on several counts. When a jury is unable to reach a unanimous decision, an *Allen* charge might be appropriate;[29] and any such charge given must not be coercive "so as to cause a juror to abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors."[30] On the other hand, "[w]here the jury is hopelessly deadlocked, . . . a mistrial is necessary."[31] Given the necessary considerations and significant ramifications, instructions to the deliberating jury concerning its reported deadlocked status on several counts constituted a substantive communication at a critical stage in Wells's criminal prosecution.[32] In light of principles espoused by the Court in cases such as *Lowery*, *Huff*, and *Hanifa*, such communication having occurred outside the presence of Wells and his attorney mandates reversal of Wells's convictions.[33]

---

[28] Id. at 807 (citations and punctuation omitted).

[29] *Black v. State*, 255 Ga. 668, 670-671 (2) (341 SE2d 436) (1986); see *Allen v. United States*, 164 U. S. 492 (17 SC 154, 41 LE 528) (1896); see also *Lowery*, supra at 71-72 (4) (a).

[30] *Lowery*, supra at 71 (citation and punctuation omitted); *Black*, supra at 671 (citation and punctuation omitted).

[31] *Reedman v. State*, 265 Ga. App. 162, 166 (6) (593 SE2d 46) (2003); see *Thornton v. State*, 145 Ga. App. 793, 795 (245 SE2d 22) (1978) (listing factors trial judge should consider in deciding whether to order a mistrial or to require jury to deliberate further).

[32] *Lowery*, supra at 72-74, 75 (4) (b) (i) (finding that the deliberating jurors' report to the judge of their deadlocked status was a "substantive communication"); see also *Wilson v. State*, 87 Ga. 583 (13 SE 566) (1891) (requiring new trial, where judge recharged jury outside defendant's presence) cited with approval in *Holsey v. State*, 271 Ga. 856, 860 (5) (524 SE2d 473) (1999) (noting that Georgia courts have consistently considered the defendant's absence from a critical part of the trial as a defect not subject to harmless error analysis); *Lindsey v. State*, 277 Ga. App. 18, 21-22 (625 SE2d 431) (2005) (reversing convictions, where defense counsel was ineffective for failing to object when learning about improper communication with deliberating jurors about the unanimity requirement, which information should have been given in open court in the defendant's presence).

[33] See *Lowery*, supra; *Huff*, supra; *Holsey*, supra; *Hanifa*, supra; *Wilson*, supra; *Lindsey*, supra.

[W]e take this opportunity to require trial courts to have jurors' communications submitted to the court in writing; to mark the written communication as a court exhibit in the presence of counsel; to afford counsel a full opportunity to suggest an appropriate response; and to make counsel aware of the substance of the trial court's intended response in order that counsel may seek whatever modifications counsel deems appropriate before the jury is exposed to the instruction.[34]

3. While certain of Wells's remaining contentions are rendered moot by our conclusion in Division 2, we address the following claims likely to recur on retrial. Wells contends that the trial court erred in denying his motion to suppress his statements (a) to the first responding police officer at the scene of the incident; (b) to the accident investigator at the scene; and (c) to an intake officer at the jail. Wells asserts that he made the statements during custodial interrogation without having been advised of his rights pursuant to *Miranda v. Arizona*.[35] The court conducted a *Jackson v. Denno*[36] hearing on Wells's suppression motion. To establish that the trial court erred in failing to suppress the statements he made before being advised of his *Miranda* rights, Wells must show that he was both in custody and being interrogated when he made the statements.[37]

(a) Regarding Wells's statements to the first responding officer misrepresenting whether he had been the driver of the vehicle, the record shows that the trial court was authorized to conclude that Wells was not in custody for purposes of *Miranda* at the time of the statements.[38]

(b) Regarding Wells's statements to the accident investigator who responded to the scene, we find no error. The record authorized the trial court to find that Wells's statements to the officer, while the officer was preparing paperwork in the patrol car with Wells, were voluntary outbursts and not the product of any interrogation.[39]

(c) Likewise, the trial court concluded that Wells's statement to the intake officer was not the product of an interrogation. At the

---

[34] *Lowery*, supra at 76.

[35] 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

[36] 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964).

[37] *Quedens v. State*, 280 Ga. 355, 358 (2) (629 SE2d 197) (2006).

[38] See id.; *Jones v. State*, 258 Ga. App. 229, 230 (573 SE2d 470) (2002); *Foster v. State*, 258 Ga. App. 601, 603-604 (2) (574 SE2d 843) (2002).

[39] See *Tennyson v. State*, 282 Ga. 92-93 (3) (646 SE2d 219) (2007) (voluntary, spontaneous outbursts that are not made in response to any form of custodial questioning or interrogation are admissible at trial); *Jones*, supra.

*Jackson-Denno* hearing, the officer who was escorting Wells when he made the statement testified:

> Q: And did you transport the defendant to the Clayton County jail?
>
> A: Yes, I did.
>
> Q: And were you present when an intake officer recognized and greeted the defendant?
>
> A: Yes, I was.
>
> Q: And was the defendant asked a question by that intake officer, such as, something like, what are you doing back, or why are you here?
>
> A: Yes, he was.

The officer again characterized the intake officer's question as a greeting and then described Wells's response as "something to the nature of, I was trying to operate my vehicle with my bad leg after I'd been drinking and I was involved in an accident."

The trial court determined that the intake officer had posed "nothing but a general question of what are you doing here or a general greeting, you know, kind of like what's up, what's happening." A trial court's determination of whether an "interrogation" occurred will be upheld on appeal unless clearly erroneous.[40]

In *Rhode Island v. Innis*,[41] the United States Supreme Court defined the "interrogation" that must be preceded by *Miranda* warnings as

> express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers . . . to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.[42]

The question at issue here was asked in a booking situation, and "[a] well-established line of federal and state case law has created an exemption from the *Miranda* rule for questions attendant to arrest, because such questions are not related to the investigation of the

---

[40] *Franks v. State*, 268 Ga. 238, 242 (486 SE2d 594) (1997).

[41] 446 U. S. 291 (100 SC 1682, 64 LE2d 297) (1980).

[42] Id. at 300-301 (footnotes omitted); see *Walton v. State*, 267 Ga. 713, 717 (4) (482 SE2d 330) (1997).

case, and at the same time serve a legitimate administrative need."[43] Georgia courts, however, have confined the booking exception to requests for basic biographical data, such as the suspect's name, age, address, educational background, marital status, and other information required to complete an arrest form.[44] Because there is no per se exception to *Miranda* for questions asked during booking, police questioning during booking outside the specified categories is scrutinized on a case-by-case basis.[45] Here, the intake officer's question to Wells was not seeking basic biographical data, and there is no assertion that the question was posed to gather information required to complete an arrest form. Moreover, the question at issue here — essentially "concerning how a suspect came to be in police custody" — falls outside the booking exception to *Miranda*.[46]

We thus turn to "whether under the totality of the circumstances the question was equivalent to 'custodial interrogation.' Relevant factors include the context in which the question was asked, the officer's intention in asking the question, and the relationship of the question to the crime."[47] Citing *Innis*, the Supreme Court of Georgia has instructed:

> The focus of whether "interrogation" occurs is primarily upon the perceptions of the suspect and not the intent of the officer, although the officer's intent is relevant. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.[48]

Viewing the intake officer's question within its context, we reject the trial court's conclusion that the question is properly deemed a "general greeting" outside the rubric of *Miranda*. Asking an individual — handcuffed, under police escort, and in the intake area of a jail — *why* he is there is patently distinguishable from a general greeting.[49] Such question is far more likely to elicit an incriminating

---

[43] *Franks*, supra at 239 (citations and footnote omitted).

[44] Id.

[45] Id. at 240.

[46] *State v. Nash*, 279 Ga. 646, 650 (3) (619 SE2d 684) (2005) (questions "concerning how a suspect came to be in police custody" are not exempt from *Miranda* as questions seeking routine biographical data for booking purposes).

[47] *Franks*, supra.

[48] Id. at 240-241 (citations and punctuation omitted).

[49] "Greeting" has been defined as "an expression of kindness or joy" and "a salutation at meeting." Webster's Third New International Dictionary of the English Language Unabridged (1981).

statement because the circumstances that landed the suspect in his situation are almost certainly directly related to the crime(s) for which he obviously is under arrest.[50]

From Wells's perspective, the question was posed by the intake officer who, given the attendant circumstances, was aware that the disclosure he was seeking was of a potentially incriminating nature.[51]

> [Wells] was therefore confronted with a "cruel trilemma" against which the Fifth Amendment protects. As the inherently coercive environment created by the custodial interrogation precluded the option of remaining silent, [Wells] was confronted with the choice of incriminating himself or lying to the [intake officer],[52]

within the escorting police officer's earshot about the events that landed him in custody.

It may well have been that the intake officer did not intend to elicit an incriminating response from Wells, whom the evidence showed that the intake officer recognized. Notwithstanding the intake officer's subjective intent, the intake officer should have known that asking Wells why he was there was likely delving into Wells's recent, suspected illegal conduct.[53]

Finally, the relationship of the information sought to the crime is "highly relevant" in determining whether the question was equivalent to "interrogation."[54] The question posed to Wells appears designed to elicit a response that could scarcely have been more incriminating because it invited Wells to speak of the very acts that had culminated in his impending booking.[55]

Given the totality of the circumstances, we find that Wells was subjected to "interrogation" in violation of his Fifth Amendment right against self-incrimination.[56] While we do not lightly substitute our judgment for that of the trial court, we conclude that the trial

---

[50] *Nash*, supra ("questions concerning how a suspect came to be in police custody are likely to elicit an incriminating response"); see also *Franks*, supra at 240.

[51] See *Franks*, supra at 241.

[52] Id. (citation and punctuation omitted).

[53] See *Nash*, supra; *Franks*, supra.

[54] *Franks*, supra at 241.

[55] *Nash*, supra; see *Franks*, supra at 241-242.

[56] See *Nash*, supra; *Franks*, supra at 242. Compare *Waits v. State*, 172 Ga. App. 524, 525-526 (2) (323 SE2d 624) (1984) (police officer's single threshold inquiry to defendant as to what was happening did not amount to custodial interrogation, where officer and defendant were old friends and former co-workers and the officer had neither knowledge of defendant's arrest nor official involvement with the case at the time of the remark).

court's finding otherwise was clearly erroneous.[57] Accordingly, Wells's response to the question is inadmissible for any purpose other than impeachment.[58]

*Judgment reversed. Johnson, P. J., and Barnes, J., concur.*

DECIDED MARCH 27, 2009.

*Herbert Adams, Jr.*, for appellant.
*Jewel C. Scott, District Attorney, Dawn Belisle-Skinner, Assistant District Attorney*, for appellee.

---

[57] See *Franks*, supra; see also *Nash*, supra.

[58] See *Franks*, supra at 242; see further *Starks v. State*, 283 Ga. 164, 166 (3) (656 SE2d 518) (2008) (citing *Harris v. New York*, 401 U. S. 222 (91 SC 643, 28 LE2d 1) (1971), for proposition that statements procured in violation of *Miranda*, and therefore inadmissible to establish guilt, can be used for impeachment).