## A11A1615. HARRIS v. THE STATE.
### (726 SE2d 455)

McFADDEN, Judge.

John E. Harris appeals the denial of his motion for directed verdict of acquittal in his prosecution for misdemeanor obstruction of a law enforcement officer. In order to affirm on this record, we would be required to hold that any refusal to cooperate, even the peaceable assertion of constitutional rights, can support an obstruction conviction. We decline to adopt such a rule and find the evidence insufficient to support the conviction. We therefore reverse.

A motion for a directed verdict of acquittal is due to be granted when there is no conflict in the evidence, and the evidence and its reasonable deductions and inferences demand it. OCGA § 17-9-1 (a). When reviewing the trial court's denial of a motion for directed verdict, the reviewing court may consider all the evidence in the case and must view the evidence in the light most favorable to the verdict. *Schroeder v. State*, 261 Ga. App. 879, 881-882 (2) (583 SE2d 922) (2003). But where, as here, the evidence of record includes an audio or video recording, "[t]o the extent that the controlling facts . . . are undisputed because they are plainly discernable from the . . . recording, we review those facts de novo." *Johnson v. State*, 299 Ga. App. 474, 474-475 (682 SE2d 601) (2009), citing *Lyons v. State*, 244 Ga. App. 658, 658-659 (535 SE2d 841) (2000). The standard for reviewing a denial of a motion for a directed verdict of acquittal is whether under the rule of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979), the evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that the defendant was guilty of the charged offense. *Harvey v. State*, 212 Ga. App. 632, 634 (2) (442 SE2d 478) (1994).

The accusation charged Harris with "unlawfully knowingly and willfully obstruct[ing] and hinder[ing] C SCAGGS, a law enforcement officer, in the lawful discharge of [her] official duties. . . ." Detective Scaggs of the Cobb County Police Department testified that on July 29, 2009, the Department of Family and Children Services ("DFCS") notified the Cobb County police that they needed to go to Harris's house to check on the welfare of a ten-day-old infant, C. H., and if she were there, to take her into protective custody. Harris is C. H.'s father. Her mother is Kayla Bagwell. C. H.'s older siblings had already been placed in protective custody; C. H.

had not been taken at the same time because she had not yet been born.

The police officers had a document reflecting a bond condition for a domestic violence case that restricted Harris's and Bagwell's contact with each other. The residence was the address Bagwell had listed with the police, the courts, and DFCS; and the bond condition stated that Harris could not be at the residence.

Five officers went to Harris's house. They knocked on the door and identified themselves. Harris exited the house and shut the door. An audio recording of the encounter was played for the jury and entered into evidence. The audio recording demonstrated that the following transpired:

> Audible footsteps
> [Inaudible]
> Male Officer 1: Is Ms. Kayla Bagwell in?
> Harris: [Inaudible] unless you've got a court order or, or [inaudible].
> Male Officer 2: We have a special bond [inaudible]
> [inaudible]
> Harris: Let me see it.
> Male Officer 1: . . . special bond . . . Ms. Kayla Bagwell [inaudible].
> Harris: This case is over with. Be right back, get. I've got a, uh, I've got the resolution to this. There's a . . .
> Female Officer: Okay, well you're not going back in there by yourself. One of us is going in there with you.
> Harris: Okay, then none of us are going.
> Male Officer 1: Is the child here?
> Harris (talking at the same time as the officer): I want you guys . . .
> Male Officer 1: Is the child here?
> Harris: What?
> Male Officer 1: Is the child here?
> Harris: What child? Okay . . .
> Male Officer 1: The ten-day old. . . .
> Harris: Okay, I would like you guys to leave.
> Male Officer 1: No sir, that's not gonna happen.
> Harris: Okay.
> Male Officer 1: We can either do this the easy way or we can do it the hard way.
> Harris: What's the easy way and what's the hard way?
> Male Officer 1: The easy way is for you to answer the questions.

Harris: I don't have to answer any questions.

Male Officer 1: Okay.

Harris: What's the hard way?

Male Officer 1 (talking at the same time as Harris): . . . do it the hard way . . . for obstruction.

Harris: For what?

Male Officer 1: For obstruction.

Harris: For what?

Male Officer 1: Obstructing . . .

Harris: Of what?

Male Officer 2: Our investigation.

Harris: Into what? [inaudible]

Male Officer 1 (talking at the same time as Harris): Into whether or not there's a deprivation of a child.

Harris: That's a civil matter.

Male Officer 1: No, it's not. [inaudible]. You think I do civil matters?

Harris: No sir, I don't.

Male Officer 1: Okay. Then why are you saying you think it's a civil matter?

Harris: Because deprivation's a civil matter.

Male Officer 1: No, it's not. It's a criminal matter. [inaudible]

Female Officer (talking at the same time as Male Officer 1): No, it's not.

Harris: No sir, deprivation is a civil matter. I mean . . .

Male Officer 1: I ain't got time for this. Turn around.

Harris: Alright.

Male Officer 1: Put your hands behind your back.

Harris: Alright, fine.

[inaudible]

Male Officer 1: Put your hands behind your back.

[inaudible]

Male Officer 1: You can sit there and say you want to obstruct us all day long.

[inaudible]

Male Officer 1: I told you and I told you.

Harris: My child is in the house.

Male Officer 1: Okay. See how easy that was?

From the knock on the door to the arrest, the entire encounter lasted 95 seconds. Harris made no threats and was not violent. At trial,

Harris testified that "I made a choice that day to not cooperate. I didn't stand in the way and tell them they couldn't come in my house; I just didn't invite them into my house and wasn't going to."

The accusation does not specify the conduct that obstructed Detective Scaggs. At trial, after recounting the events leading up to Harris's arrest, an officer described his conduct as "basically, just refusing to cooperate." On cross-examination that officer conceded that the basis for Harris's arrest was "only . . . two things . . . he did not allow [the officers] in the house and he didn't answer questions about the child." In its brief on appeal, the state argues that Harris's conviction can be sustained on the basis of his "demand for the officers to leave the premises" and his "attempt[ ] to misdirect the officers by repeatedly asking 'what child,' feigning ignorance of the situation."

1. Harris argues that the trial court erred in not granting his motion for directed verdict because he did not obstruct the police but instead stood on his rights under the First, Fourth and Fifth Amendments to the United States Constitution. We agree with Harris that his conduct did not constitute obstruction under the statute.

Because our decision is founded on statutory construction, we need not reach Harris's implicit claim that the obstruction statute, as applied to his behavior, violated the Constitution. See *Powell v. State*, 270 Ga. 327, 327-328 (1) (510 SE2d 18) (1998) (if appeal can be decided upon other grounds, it will not be decided upon constitutional grounds); *Southern R. Co. v. Schlittler*, 1 Ga. App. 20 (58 SE 59) (1907) (same). See generally *Ga. Transmission Corp. v. Worley*, 312 Ga. App. 855, 856 (720 SE2d 305) (2011) (all statutes are presumed to be enacted with full knowledge of existing law); *Haley v. State*, 289 Ga. 515, 521 (2) (b) (712 SE2d 838) (2011) (construing statute prohibiting the making of a false statement in matter within jurisdiction of government agency in manner so as to avoid First Amendment concern).

OCGA § 16-10-24 (a) provides that a person commits misdemeanor obstruction if the person "knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties." As an initial matter, we agree with the state that the jury was authorized to conclude that the officers were acting in the lawful discharge of their duties. The state presented evidence that the officers had the authority to conduct a welfare check on the child pursuant to an open deprivation case.

The more difficult question is whether the statute criminalizes Harris's conduct. We conclude that it does not.

The statute's history sheds some light on its intended scope. At one time, this court construed the misdemeanor obstruction statute

so that violence — or its verbal equivalent — was an essential element of the crime. See, e.g., *Moccia v. State*, 174 Ga. App. 764, 765 (331 SE2d 99) (1985); *McCook v. State*, 145 Ga. App. 3, 5 (2) (243 SE2d 289) (1978). Cf. *Hudson v. State*, 135 Ga. App. 739, 741-742 (2) (218 SE2d 905) (1975). But the statute was revised in 1986, and "the offense of misdemeanor obstruction under existing OCGA § 16-10-24 (a) no longer contains the element of violence as does the offense of felony obstruction under existing OCGA § 16-10-24 (b)." (Citations omitted.) *Stryker v. State*, 297 Ga. App. 493, 495 (677 SE2d 680) (2009).

> [T]he [misdemeanor obstruction] statute was made purposefully broad to cover actions which might not be otherwise unlawful, but which obstructed or hindered law enforcement officers in carrying out their duties. This does not, however, make any actions which incidentally hinder an officer a crime. . . .

*Hudson*, 135 Ga. App. at 742 (noting the requirement that the conduct must be knowing and wilful). "Certainly the assertion of one's constitutional rights cannot be an obstruction of an officer, or every assertion of such rights would lead to obstruction charges." *Ballew v. State*, 245 Ga. App. 842, 843 (1) (538 SE2d 902) (2000), disapproved in part on other grounds, *Stryker*, 297 Ga. App. at 495, n. 1.

Although we have held that words alone can constitute obstruction, *Stryker*, 297 Ga. App. at 495, we have found no case upholding an obstruction conviction based solely upon a defendant's act of speaking to, remonstrating with, or even criticizing an officer during the performance of his duties. Indeed, in the opinions upholding misdemeanor obstruction convictions based on a defendant's words, the defendant: (1) instructed another person to remove evidence from the crime scene, id. at 493; (2) remonstrated so loudly that she interfered with an officer's interview of individuals who had reported a crime, despite the officer's instruction that she leave the scene, *Carter v. State*, 222 Ga. App. 397, 397-398 (1) (474 SE2d 228) (1996); (3) deliberately misled the officer about his identity, *Wilson v. State*, 261 Ga. App. 576, 578 (2) (583 SE2d 243) (2003); *Herren v. State*, 201 Ga. App. 509, 510 (1) (411 SE2d 552) (1991); (4) wilfully lied about the whereabouts of the subject of a bench warrant an officer was attempting to serve, *Hudson*, 135 Ga. App. at 742-743 (3); (5) wilfully lied to an officer, who was trying to execute an arrest warrant, about the present location of the arrestee, *Duke v. State*, 205 Ga. App. 689 (423 SE2d 427) (1992); and (6) deliberately misled the first responding officer about his role in a car wreck, *Wells v. State*, 297 Ga. App.

153, 154 (1) (676 SE2d 821) (2009).

Other cases upholding misdemeanor obstruction convictions involve words plus something more. See, e.g., *Steillman v. State*, 295 Ga. App. 778, 781 (2) (673 SE2d 286) (2009) (using fighting words and resisting arrest for disorderly conduct; involving felony and misdemeanor obstruction); *Pinchon v. State*, 237 Ga. App. 675-676 (516 SE2d 537) (1999) (arguing with police officer, refusing to comply with instruction to take written citation, and attempting to walk away when officer told defendant she was under arrest); *Leckie v. State*, 231 Ga. App. 760-761 (500 SE2d 627) (1998) (after being advised he was under arrest for disorderly conduct, defendant announced he was not going to jail, purposefully turned away from the officer and attempted to avoid being handcuffed).

Harris did not refuse to comply with an officer's directive or command. No officer ever asked to enter his house. No officer ever asked him to produce the child. Harris was not threatening or violent. The audio recording demonstrates that Harris did not raise his voice, although the arresting officer raised his. The entire incident lasted 95 seconds.

We need not reach the legal merits of the proposition that the conviction can be sustained on the basis that Harris asked the officers to leave or that he should have allowed the officers into the house. The audio recording shows that there was never any mention of entry into Harris's house without his consent.

The audio recording establishes that the officers made clear at the time of the arrest that it was for refusing to answer questions about the child. The officers presented Harris with a choice between answering their questions or being arrested for obstruction. Harris was arrested for peaceably asserting his constitutional rights as he understood those rights. That cannot be obstruction. *Ballew,* supra.

Harris's single two-word response — "What child?" — cannot salvage this conviction. We note that, notwithstanding the testimony of the officers who appeared at trial, the audio recording establishes that Harris asked this question only once. See *Johnson*, 299 Ga. App. at 474. The question cannot be deemed obstruction. It did not in fact deceive the officers; DFACS had already informed them that there was a child. It did not materially expand the 95-second exchange. An officer immediately responded, "the ten-day old," and the discussion turned to the officers' rejection of Harris's request that they leave.

There is no merit to the dissent's suggestion that the question caused the officers to be "deceived about . . . the welfare of the child" so that they "could not leave without verifying that the child was alive and well." Their assignment was to take the child "into protective custody."

We find that Harris's "conduct does not rise to the level of

obstruction as a matter of law"; because we have so found, his conviction cannot stand. *Beckom v. State*, 286 Ga. App. 38, 41 (2) (648 SE2d 656) (2007) (evidence that defendant was slow to come to the door, was verbally abusive, and told officers that she had no knowledge of a juvenile who was actually in her home was insufficient to support conviction). See also *Jackson*, 443 U. S. 307. We therefore reverse.

2. Given the reversal, we do not reach Harris's other enumeration of error.

*Judgment reversed. Barnes, P. J., Phipps, P. J., and Mikell, P. J., concur. Andrews, Dillard and Boggs, JJ., dissent.*

ANDREWS, Judge, dissenting.

Because the evidence before the jury was that officers were lawfully discharging their duties when they were sent by DFCS to check on the welfare of the child, and because Harris impeded them in this lawful discharge of their duties when he pretended that he did not know to what child they were referring, the jury was authorized to find Harris guilty of misdemeanor obstruction of an officer. Accordingly, I respectfully dissent.

The transcript shows that a DFCS investigator went with officers from the Crimes Against Children Unit to the home of Kayla Bagwell who had a current case with DFCS and two children already in protective custody. Harris was identified as the father of all three children and had recently been arrested for aggravated assault against Bagwell. At trial, the officer explained that his division worked with DFCS and carried out "child welfare checks" for DFCS whenever there was any reason to believe that "a child is not being properly cared for." The officer stated that the complaint could come from anywhere and their unit was responsible for checking on the child.

Here, DFCS requested the welfare check on the newborn C. H. because of the ongoing case in which the two older children were already in protective custody. When asked whether officers brought court orders or warrants with them when doing child welfare checks, the response was, "No, sir; we don't need it."

The officer testified: "We didn't even necessarily have to enter into the residence if he would have brought the child out to us, but he — every time the child question would come up, he would say, "What child?" and "I don't know who you're talking about." Although Harris tried to argue to the jury that he was confused about which child of his the officers meant when they asked the question, the transcript shows that after he was arrested, Harris stated, "Okay, my child's inside the house." The officer responded: "See how easy that was?" Harris also stated at trial: "I knew who

they were asking about, but I was not going to answer the question." Further, the audiotape shows that an officer responded "the ten-day old" when Harris asked "what child?"

Because this is an appeal from a jury verdict, we must look to the evidence before the jury and determine whether a rational trier of fact could have found beyond a reasonable doubt that the officers were in the lawful discharge of their duties when they went to Harris's house to inquire about the welfare of the child. The officers' undisputed testimony was that DFCS may, during an open and continuing deprivation case, conduct "child welfare checks" at the home. When asked whether officers needed any court order, the response was that they did not. The jury was charged on the law of obstruction and told "[w]hether or not the actions of the defendant did hinder or impede the officers from carrying out their assigned duties is for you, the members of the jury to decide."

The jury found Harris guilty and there was more than sufficient evidence to support the verdict. There was no evidence presented to the jury that officers did not have a right to conduct a welfare check on the child pursuant to an open deprivation case. Harris admitted that he deliberately refused to answer their questions about the welfare of his child. Accordingly, a rational trier of fact was authorized to conclude that the officers were in the lawful discharge of their duties when they went to Harris's house to inquire about the child, and that he impeded them in their discharge of those duties. See *English v. State*, 257 Ga. App. 741, 743 (572 SE2d 86) (2002) (affirming that defendant was guilty of obstruction even though defendant claimed that officer was on private property and officer stated that he was not; it was for the jury to resolve conflicts in the evidence and reach a determination as to the facts).

Further, there is no issue raised that Harris was somehow convicted of obstruction because he refused to let officers enter his house. The audiotape of the entire incident leading up to Harris's arrest was played for the jury and shows that there was never any mention of an entry into Harris's house without his consent. Officers were clear that the arrest was for refusing to answer questions about the child. Harris acknowledges this in his brief when he states that the "core" of the prosecution's case is the accusation that he obstructed officers by failing to answer their questions about the whereabouts of the child and her mother. More importantly, Harris himself attempted to bring out in cross-examination that officers never asked permission to come in the house, but rather arrested him because he refused to cooperate in the investigation into the welfare of the child. The audiotape confirms this, with the officer telling Harris that he is arresting him because he would not answer the questions. Harris's statement at trial was that officers "were

absolutely convinced that I was going to talk to them because they were going to make me. I just wouldn't talk. That's it."

The majority holds that Harris cannot be charged with obstruction for responding "what child" when officers asked him about the baby because "[i]t did not in fact deceive [them, nor did it] materially expand the 95-second exchange." The majority does not cite to any authority, factual or legal, for this statement. Of course the officers were not deceived into believing that there was no child; DFCS had already informed them that there was a child. What they were deceived about was the welfare of the child. By professing to have no knowledge of any child, Harris was not only obstructing a lawful investigation but, in addition, his response raised valid concerns about the child's welfare. As previously stated, Harris had a history of family violence. At that point, the officers could not leave without verifying that the child was alive and well.

*Beckom v. State*, 286 Ga. App. 38 (648 SE2d 656) (2007), the only authority cited by the majority in reaching its holding, is not on point. In that case, this Court held that there was no authority for the State's

> proposition that an individual's failure to answer the phone and failure to answer a knock on the door constitutes obstruction under OCGA § 16-10-24 (a), where there is no evidence that the individual knew of an on-going investigation, and certainly no evidence that the individual was attempting "knowingly and willfully" to impede such an investigation.

Id. at 42.

In this case it is undisputed that Harris knew of an ongoing investigation as to the welfare of his children and the family violence issue and there is undisputed evidence, his own admission, that he lied to the officers. See *Wells v. State*, 297 Ga. App. 153, 157 (676 SE2d 821) (2009) (finding obstruction of a law enforcement officer by giving misleading information to police officer responding to accident); *Duke v. State*, 205 Ga. App. 689, 690 (423 SE2d 427) (1992) (The trial court was authorized to find that appellant's lie as to whether the arrestee was present in her home actually hindered and obstructed the officers in their efforts to make the arrest.).

"Whether a defendant's actions actually hindered or impeded an officer is a decision for the trier of fact." *Williams v. State*, 289 Ga. App. 402, 403 (657 SE2d 556) (2008). Accordingly, the trial court did not err in denying Harris's motion for directed verdict, and the judgment should be affirmed.

I am authorized to state that Judge Dillard and Judge Boggs join in this dissent.

DECIDED MARCH 15, 2012.

John E. Harris, *pro se.*

*Barry E. Morgan, Solicitor-General, Christopher S. Lanning, Thomas J. Campbell, Assistant Solicitors-General*, for appellee.