[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11410

Non-Argument Calendar

_____

LONDON R. BOUVIER,

Plaintiff-Appellee,

*versus*

CITY OF COVINGTON, GEORGIA, et al.,

Defendants,

OFFICER STARR SMITH,
#211 in her Official capacity & Personal capacity,
OFFICER BRANDON WILKERSON,
#205 in his Personal & Official capacities,
OFFICER SCOTT FAIRBURN,

#228 in his Personal & Official capacities,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cv-04597-VMC

_____

Before WILLIAM PRYOR, Chief Judge, and NEWSOM and ANDERSON,
Circuit Judges.

PER CURIAM:

Sergeant Starr Smith and Officers Brandon Wilkerson and Scott Fairburn appeal the denial of their motion for judgment on the pleadings against London Bouvier's complaint of unlawful seizure and excessive force in violation of the Fourth Amendment. 42 U.S.C. § 1983. After our review of the relevant video recordings, we reverse the denial of qualified immunity and remand with instructions to dismiss the complaint against the officers.

The facts are not reasonably in dispute because the encounter between Bouvier and the officers was recorded on two body-worn cameras, and neither party disputes the authenticity of the videos on appeal. We accept Bouvier's allegations as true, but where the video clearly contradicts her allegations, we view the

23-11410                  Opinion of the Court                  3

facts "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

On August 18, 2018, the officers responded to a 9-1-1 call from Lance Taylor, a contract security guard for Piedmont Hospital Newton, regarding a disturbance in the labor-and-delivery unit. Smith was the first to arrive. Taylor told Smith that the hospital staff "were trying to give this girl an epidural" but that another girl, later identified as Bouvier, "was refusing to leave the room after she was asked numerous times by the staff. We asked her. She wouldn't leave." Taylor said that the staff "finally just got the procedure done anyway," but the doctor said that he wanted "her to follow the rules." Taylor also told Smith, "[I]f she's gonna act like that all day, . . . if she's gonna be interfering with the staff and all that, she's probably gonna end up having to go." He explained it was up to the hospital representative to decide whether to remove Bouvier.

Inside the hospital room, Smith asked the representative, "Do you want her to stay or no?" The representative whispered, "No," and then hesitated, "I don't know. . . . If they were able to do the procedure, then—then I'm cool. Um, but if this continues, then yes, she's going to have to . . . because she's putting the patient at risk." Smith relayed that the doctor was able to administer the epidural and said, "[I]f you want her out, she'll be out. I don't want her giving y'all a hard time all day long."

Wilkerson and Fairburn arrived and stood outside the room while Smith waited to speak to one of the nurses. As the nurse was

leaving the room, she widened her eyes at the hospital representative and inhaled. When the hospital representative asked if the nurse wanted Bouvier removed, the nurse raised her eyebrows, made a face, and said that she only had ten minutes left on her shift so Bouvier could "f**k off for all I care." The representative told Smith, "She's okay for now."

Smith walked into the room and said to Bouvier, "Ma'am. Ma'am. Come here for me." After Bouvier ignored her, Smith said, "[Y]ou're giving a problem. So instead of removing you—listen, listen—instead of removing you, I just need to speak with you." Bouvier asked "[a]bout what?" and Smith stated, "About the whole thing. So, so you can stay here with [your friend], put the cup down and come talk to me." Bouvier's friend told Bouvier to talk to Smith and asked Smith to promise that Bouvier could come back. Smith said, "Yes, if she cooperates with me," and again told Bouvier to come talk to her.

Outside the room, Smith asked Bouvier if she had identification on her, and Bouvier said she did but asked, "For what?" Smith explained that Bouvier could make this as simple or as hard as she wanted to, and Bouvier responded, "You guys are doing too much." Bouvier then told her friend's boyfriend, Mr. Young, "They're kicking me out of the hospital." Smith said, "No I'm not. If you'll listen to me, I want your ID, and I want you to cooperate. And then you can stay." Bouvier said, "For what? I didn't get stopped by an officer." The other officers explained, "We're here for you," and, "We're here for a reason. The law says you have to

give us your ID." During this exchange, Smith explained to Young that his girlfriend wanted Bouvier to stay, but Bouvier was not co-operating with staff or the officers. After Bouvier complained about the hospital's service and told the officers that they were "starting problems," she tried to walk past Smith to re-enter the room, but Smith extended her arm across the doorway. Bouvier said that Smith had committed a battery and began shouting, "My boy-friend's mother is an officer," and "Don't make me make those calls."

Because of the shouting, a nurse closed the door to the room. At that point, Smith announced to Bouvier and the other officers, "There are other people here. We're fixin' to get out of the hospital." Bouvier said she was making a phone call to an officer she knew and grabbed onto the railing on the wall behind her with both hands. Smith grabbed Bouvier's arm and said three times, "It is time for you to leave," while moving her away from the door. A few seconds later, Bouvier, who was arguing with Fairburn and Wilkerson, pulled her arm away from Smith. Smith announced that Bouvier was under arrest and instructed twice, "Give us your hands now." Bouvier instead pulled her hands up to her chest so that Smith could not handcuff her.

Bouvier alleges that she was wrestled to the floor. Because the video is unclear about whether she dropped or was forced to the floor, we accept Bouvier's allegation. In either event, after Bou-vier was face down on the floor, Smith shouted six times, "Give us your hands," but Bouvier screamed and refused to unlock her

arms. One officer used a pressure-point technique to keep Bouvier on the floor, but Smith and the other officer still were unable to get both of Bouvier's hands behind her back to be handcuffed. After the officers announced "Taser" eight times, one of the officers deployed his Taser in a five-second burst, a two-second burst, and a three-second burst, over the course of 17 seconds. An officer explained to Young that they were tasing her "[be]cause she won't comply."

After Bouvier put her hands behind her back and was handcuffed, the officers pulled Bouvier to her feet and walked her out of the labor-and-delivery unit while she continued yelling at and struggling with them because she wanted to go back for her cell phone. Smith told Bouvier three times that she was "still not obeying orders." Bouvier was charged with misdemeanor disorderly conduct, O.C.G.A. § 16-11-39(a), and misdemeanor obstruction, *id.* § 16-10-24(a).

Bouvier complained that the officers violated her Fourth Amendment rights by unlawfully seizing her and using excessive force. 42 U.S.C. § 1983. The officers submitted the video from Smith's body-worn camera and moved for judgment on the pleadings based on qualified immunity. The officers argued that, when they arrived at the hospital, they had probable cause to detain or arrest Bouvier for criminal trespass based on the 9-1-1 call plus Taylor's statement that she had refused the staff's instructions to leave a patient's room during a sterile medical procedure. The officers argued that, instead of arresting Bouvier upon arrival, they

investigated whether she would be willing to follow the hospital's rules going forward so that she could stay. The officers argued that when Bouvier refused to give them her identification, became loud and belligerent, and refused to walk away from the room with them, they had probable cause to arrest her for hindering their investigation. The officers also argued that they used reasonable force to arrest Bouvier. In response, Bouvier submitted video footage from one of the male officers' body-worn cameras.

The district court denied the motion and ruled that the officers were not entitled to qualified immunity. The district court rejected the officers' argument that they had probable cause to detain Bouvier for criminal trespass. The district court ruled that the officers lacked probable cause to arrest Bouvier for obstruction because, although refusing to comply with an officer's command is sufficient to sustain an obstruction charge in Georgia, it was a "first-tier" encounter under Georgia law in which Bouvier was free to walk away. *See, e.g.*, *State v. Walker*, 764 S.E.2d 804, 805–06 (Ga. 2014). The district court ruled that tasing Bouvier was objectively unreasonable because it was unclear whether she committed a crime, posed an immediate threat, or was required to comply with the officers' commands. Regarding whether the officers violated a clearly established right, the district court stated that the officers were "mistaken when they contend that the only way to show a violation of a clearly established right is by pointing to judicial decisions" and cited our decision in *Fils v. City of Aventura*, 647 F.3d 1272 (11th Cir. 2011).

We review *de novo* the denial of a motion for judgment on the pleadings. *Mergens v. Dreyfoos*, 166 F.3d 1114, 1116 (11th Cir. 1999). A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss for failure to state a claim and should be granted when there are no issues of material fact, and the movant is entitled to judgment as a matter of law. *Samara v. Taylor*, 38 F.4th 141, 149, 152 (11th Cir. 2022).

Qualified immunity shields officials who are acting within their discretionary authority from liability when their conduct does not violate a constitutional right that was clearly established at the time of the conduct. *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020). "We are required to grant qualified immunity to a defendant official" who was acting within her discretionary authority unless the plaintiff can prove "(1) that the facts, when construed in the plaintiff's favor, show that the official committed a constitutional violation and, if so, (2) that the law, at the time of the official's act, clearly established the unconstitutionality of that conduct." *Singletary v. Vargas*, 804 F.3d 1174, 1180 (11th Cir. 2015).

The officers argue that they are entitled to qualified immunity because they had probable cause to arrest Bouvier for obstruction based on her ongoing disruptive behavior and failure to comply with orders to walk away from the patient's room with them. A warrantless arrest must be supported by probable cause to believe that the suspect committed a crime. *See Huebner v. Bradshaw*, 935 F.3d 1183, 1187 (11th Cir. 2019). "Probable cause exists when the facts, considering the totality of the circumstances and viewed

from the perspective of a reasonable officer, establish 'a probability or substantial chance of criminal activity.'" *Washington v. Howard*, 25 F.4th 891, 898–99 (11th Cir. 2022) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). To determine whether probable cause exists, we ask "whether a reasonable officer *could* conclude . . . that there was a substantial chance of criminal activity." *Id.* (omission in original).

Georgia law defines obstruction as "knowingly and willfully obstruct[ing] or hinder[ing] any law enforcement officer . . . in the lawful discharge of his or her official duties . . . ." O.C.G.A. § 16-10-24(a) (2019). This offense "was made purposefully broad to cover actions which might not be otherwise unlawful, but which obstructed or hindered law enforcement officers in carrying out their duties," such as refusing to comply with an officer's directive or command, *Harris v. State*, 726 S.E.2d 455, 458 (Ga. Ct. App. 2012), or refusing to identify oneself after being lawfully obtained, *see Draper v. Reynolds*, 369 F.3d 1270, 1276–77 n.10 (11th Cir. 2004); *Pinchon v. State*, 516 S.E.2d 537, 538 (Ga. Ct. App. 1999).

The district court erred in denying the officers qualified immunity from Bouvier's claim of an unlawful seizure. To start, the officers had reasonable suspicion to detain Bouvier outside the hospital room based on the 9-1-1 call and the circumstances at the hospital. *See United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000) ("[L]aw enforcement may detain a person briefly for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage

in, criminal activity."). When Smith entered the hospital room, she knew Bouvier had caused a disturbance with the doctor and staff by refusing to leave when instructed to do so, and the disturbance had escalated to the point that the hospital security guard sought the officers' assistance. During her investigation, Smith spoke to Taylor, the hospital representative, a nurse, and Bouvier. Taylor and the hospital representative agreed that Bouvier could not stay if she continued to cause issues, and the nurse was visibly affected by Bouvier's behavior. The representative's statement that Bouvier was "okay" was qualified by "*for now*" and reasonably suggested to the officers that the staff was concerned that Bouvier would cause another disturbance. So the officers had a reasonable, articulable suspicion to detain Bouvier to investigate, and the district court erred by applying the tier-approach for detentions under Georgia law instead of the reasonableness standard of the Fourth Amendment. *See Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve.").

Probable cause supported Bouvier's arrest because a reasonable officer could conclude that she was obstructing their lawful investigation. After being detained, Bouvier tried to walk away from the officers, refused their requests for identification, raised her voice, and defied Smith's instruction that the group walk away from the patient's room by grabbing onto the railing on the wall. *See Draper*, 369 F.3d at 1276–77 (granting qualified immunity where the defendant refused to produce requested documents and "acted in a confrontational and agitated manner, paced back and forth,

and repeatedly yelled at [the officer].”); *Harris*, 726 S.E.2d at 458. Because the officers had probable cause to seize Bouvier, they are entitled to dismissal of this claim.

We also agree with the officers that the district court erred in denying qualified immunity because the officers' use of force was reasonable. Neither Bouvier nor the district court cited caselaw establishing her right to be free from nondeadly force while actively resisting a lawful arrest. The district court cited our decision in *Fils*, but *Fils* supports the officers' position. In *Fils*, we held that the use of unprovoked force against a non-hostile, non-violent suspect who has *not* disobeyed instructions violates that suspect's rights under the Fourth Amendment. 647 F.3d at 1290. But we explained that "where a suspect appears hostile, belligerent, and uncooperative, use of a Taser might be preferable to a physical struggle causing serious harm to the suspect or the officer." *Id.* (quotation marks omitted). By contrast, in *Oliver v. Fiorino* we held that tasing a compliant, nonthreatening individual eight times in under two minutes, resulting in his death, violated the Fourth Amendment. 586 F.3d 898, 906–08 (11th Cir. 2009). We explained that, although the initial deployment of the Taser might have been justified, repeatedly deploying the Taser and reloading it to continue tasing the individual, who was not suspected of a crime and did not act belligerently, was unreasonable under the circumstances as a matter of obvious clarity, such that a reasonable officer in the situation would have recognized that his actions were unlawful. *Id.* at 903–08.

Although Bouvier posed no violent threat and was being arrested for a misdemeanor, her physical resistance to being handcuffed caused a physical struggle and pile-up in the hallway of a maternity ward. Despite eight total commands from Smith to give the officers her hands, Bouvier kept her hands pulled up to her chest and her elbows locked to avoid being handcuffed. Smith and another officer tried to pull her arms back but were unsuccessful. In the light of Bouvier's physical resistance and refusal to comply with repeated verbal commands, the application of the Taser for 10 total seconds within a 17-second period to gain control of her and restore order to the hospital unit was not "wholly disproportionate to the situation." *Reese v. Herbert*, 527 F.3d 1253, 1274 (11th Cir. 2008). And because this force was not excessive, it could not have been clearly established or apparent to the officers that the force was unlawful at the time of the incident. *See Charles v. Johnson*, 18 F.4th 686, 701 (11th Cir. 2021).

We **REVERSE** the denial of the officers' motion for judgment on the pleadings and **REMAND** with instructions to dismiss Bouvier's complaint against the officers based on qualified immunity.