**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**March 10, 2021**

# In the Court of Appeals of Georgia

A20A1711. ZERBARINI v. THE STATE.

GOBEIL, Judge.

A jury convicted Thomas Edward Zerbarini of aggravated child molestation, incest, two counts of child molestation, and enticing a child for indecent purposes, related to Zerbarini's conduct towards two child victims. He has appealed from his judgment of conviction and the trial court's denial of his motion for new trial, as amended. On appeal, Zerbarini asserts: (1) (a) trial court error in failing to allow counsel a full opportunity to respond to a note sent from the jury during deliberations and (b) in failing to correctly instruct the jury in response to the note; (2) trial court error in failing to give a curative instruction to the jury after a witness bolstered the testimony of another witness; (3) ineffective assistance of trial counsel; (4) trial court

error in sentencing by failing to merge two counts; and (5) conflict of interest of the trial judge. For the reasons set forth below, we affirm the trial court's order.

> On appeal from a criminal conviction, the evidence must be viewed in the light most favorable to support the verdict, and the defendant no longer enjoys the presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility.

*Williams v. State*, 333 Ga. App. 879, 879 (777 SE2d 711) (2015) (citation and punctuation omitted).

Thus viewed in the light most favorable to the verdict, the record shows that M. B., who was 13 years old at the time of trial in December 2017, was Zerbarini's neighbor. Zerbarini molested M. B. on two separate occasions in 2013 and 2014 by touching her private parts. T. Z., who was eight years old at the time of trial, is Zerbarini's daughter. Zerbarini molested T. Z. on multiple occasions sometime between October 2012 and July 2014 by licking her private parts. Both girls testified to the molestations at trial.

Based on this conduct, Zerbarini was charged with aggravated child molestation (Count 1) and incest (Count 2) based on acts of sodomy toward T. Z., and was charged with two counts of child molestation (Counts 3 and 4) and one count of

2

enticing a child for indecent purposes (Count 5) based on acts of touching M. B. Zerbarini proceeded to trial, represented by counsel. His trial took place over several days from December 4, 2017, through December 15, 2017.

Although Zerbarini was charged only in connection with two victims, other witnesses testified that Zerbarini molested them while they were children, including Zerbarini's other daughter, A. Z., who was twelve years old at the time of trial, and Zerbarini's niece, Z. S., who was nine years old at the time of trial. Two older witnesses, both relatives of Zerbarini's, testified that he molested them years ago when they were children. Specifically, L. B. testified that Zerbarini molested her by putting his hand down her shorts and "moving his hand around [her] vagina" in 2006, when she seven years old. J. S. testified that Zerbarini molested her twice by putting his hand inside her underwear when she was four years old. One of Zerbarini's sons testified that he witnessed Zerbarini sucking his sister A. Z.'s breasts in the basement of their home.

Zerbarini put forward several defense witnesses, including multiple people who testified that he was known by them to be appropriate with children. Zerbarini testified in his own defense, fully denying the allegations against him. Zerbarini explained that his wife, Lynne Zerbarini, was molested as a child and was extremely

suspicious that her own children were being molested by him, accusing him on multiple occasions. In May 2014, Zerbarini was exchanging flirtatious text messages with another woman, and Lynne saw the messages. Lynne told Zerbarini that she intended to file for divorce and move with the children to New York. Zerbarini told her he intended to fight for custody of the children. Shortly thereafter, Zerbarini heard from his children that their mother had again begun to question them about whether Zerbarini had been inappropriate with them.

To support Zerbarini's theory that Lynne influenced the children into making the allegations of molestation, Zerbarini called as a witness Dr. Maggie Bruck, a psychologist who specializes in the strength and distortion of children's memories. Dr. Bruck was admitted as an expert witness in the area of child sexual abuse disclosures. Dr. Bruck testified that Lynne's repeated questioning of the children regarding whether Zerbarini molested them, combined with Lynne's obvious anger towards Zerbarini, could have resulted in the children inventing false allegations against their father. She further opined that the outcries from Zerbarini's daughters and his younger niece, Z. S., to their respective mothers could have been improperly influenced by their mothers' disdain towards Zerbarini and belief that Zerbarini had been inappropriate with the girls. Additionally, M. B.'s outcry could have been

4

influenced by the same suggestive environment because her parents also repeatedly questioned her if Zerbarini had molested her and did not take precautions to ensure that M. B. was not influenced by their behavior. According to Dr. Bruck, the older victims' accounts of molestation from many years ago could either have been influenced by the recent allegations, or could have been false memories. Zerbarini rested his case after Dr. Bruck's testimony.

After deliberating for several hours over two days, the jury returned a guilty verdict on all counts. The trial court imposed a life plus 35 year total sentence. After retaining appellate counsel, Zerbarini filed a motion for new trial, as amended. After two days of hearings, at which multiple witnesses testified, the trial court denied Zerbarini's motion. This appeal followed.

1. Zerbarini asserts that his constitutional right to counsel was violated when trial counsel was not given an opportunity to respond fully to a note submitted by the jury during deliberations. He also asserts that the court's response to the jury's note, which included giving an incomplete and incorrect *Allen*[1] charge, was coercive and

---

[1] *Allen v. United States*, 164 U. S. 492 (17 SCt 154, 41 LE 528) (1896). An *Allen* charge is given by the trial court when the jury in a criminal trial indicates that it is deadlocked, encouraging the jurors to reexamine their opinions in continued deliberations and to attempt to reach a unanimous verdict. See id.; *Drayton v. State*, 297 Ga. 743, 746-747 (2) (a) (778 SE2d 179) (2015). "When a jury is unable to reach

contributed to the verdict. As these claims are closely related, we will consider them together.

Zerbarini's claims arise out of a question submitted by the jury to the court. After approximately nine hours of deliberation over two days, the jury sent a note to the court asking: "Can we be a hung jury on one or more counts and convict on the others?" The trial court held a conference in chambers with the attorneys to discuss the note. Because the note indicated the possible direction of the jurors' votes, the court did not show the note or read it verbatim to the attorneys. The court explained the contents of the note as follows: "What they wanted to know was could they be hung on one count and reach decisions on the other counts." The court suggested giving an *Allen* charge, and again stated that "it appears it's just one matter that they're – have an incomplete decision on." The court asked for input from the attorneys.

Trial counsel stated his understanding of the note:

[COUNSEL]: There's five counts in the indictment, so they're saying they have a verdict on four of the five counts. So, as far as I'm

_____

a unanimous decision, an *Allen* charge might be appropriate." See *Wells v. State*, 297 Ga. App. 153, 160 (2) (676 SE2d 821) (2009) (citations omitted).

concerned, you know, it's not like they're – you know, it's not – That seems to be sufficient for me, to let them just have a verdict[.]

THE COURT: But don't you want an Allen charge?

 . . .

[COUNSEL]: They have a verdict on four of the five counts, so I'm not asking for an Allen charge.

THE COURT: Okay. If –

[COUNSEL]: If they were split on all of the counts then that would be different. . . .

The State asked the court to give the *Allen* charge. The court believed that it would be inconsistent to answer the jurors' question that they were allowed to be a hung jury on one count while also giving them an *Allen* charge. The court intended to first ask the foreman if he believed it was possible for the jury to reach a unanimous verdict on every count, and if the answer was no, the court would come back and discuss additional possibilities with the attorneys. Otherwise, the court would give an *Allen* charge. Trial counsel did not object to this plan.

Back in the courtroom, the trial court asked the jury foreman if he believed that it was possible for the jury to reach a unanimous verdict on every count if given more time. The foreman responded, "I would say so." The court then instructed the jury as follows:

> Ladies and gentlemen, I don't wish to know how anybody's leaning on anything. All I want to tell you is we've been here a long time; y'all have been very attentive; you've been brought in and out; we've been deliberating for quite awhile; however, since the foreman believes that a decision could be made on each count as a unanimous verdict, I'm going to ask you to please retire and continue to work.
>
> If you reach a point, Mr. Foreman, of – that you think it is impossible I'd like to know; and then I will look at the options at that time.
>
> But it needs to be a unanimous verdict on each count, ladies and gentleman, if you may reach it.

Approximately 50 minutes later, the jury returned with the verdict, which was unanimous and guilty on all counts. The court polled the jury, asking each juror if the verdict represented his/her decision. Each juror answered affirmatively. The jury was then excused.

(a) Zerbarini contends that his right to counsel was violated because the court's incorrect and misleading explanation of the substance of the jury note kept counsel from being able to form an informed and complete response on how to advise the jury.

"Both the Supreme Court of Georgia and this Court have recognized that the failure of the trial court to inform counsel of the contents of a jury note and to seek comment or input in the formulation of the court's response constitutes a violation of a defendant's right to counsel." *Dowda v. State*, 341 Ga. App. 295, 299 (3) (799 SE2d 807) (2017) (citation and punctuation omitted). The Supreme Court requires a trial court to, among other things, "afford counsel a full opportunity to suggest an appropriate response" to a jury communication. *Lowery v. State*, 282 Ga. 68, 76 (4) (b) (ii) (646 SE2d 67) (2007).

Here, we agree with Zerbarini that the trial court's explanation of the contents of the note was error. Not only did the court not inform trial counsel of the exact contents of the note, it mischaracterized the message sent by the jury. While the note itself suggested that the jury was potentially hung on "one or more counts," the court led trial counsel to believe that the jury had reached a unanimous verdict on all but one count, specifically stating "it appears it's just one matter that they're – have an

9

incomplete decision on." Indeed, trial counsel incorporated this interpretation into his response during the chambers conference, stating that "they have a verdict on four of the five counts." Thus, trial counsel's opportunity to respond to the jury's note cannot be said to have been full and fair, as it was tainted by the trial court's misrepresentation of the situation at hand. Compare *Humphreys v. State*, 287 Ga. 63, 77-78 (8) (a) (694 SE2d 316) (2010) (although trial court did not divulge the exact contents of jury note, experienced defense counsel was able to infer the truth of the situation at hand based on the summary provided by the court), overruled on other grounds by *Willis v. State*, 304 Ga. 686, 706 n. 3 (9) (820 SE2d 640) (2018). Accordingly, under any standard,[2] we find that the trial court erred by failing to accurately communicate the substance of the note to counsel and failing to allow counsel a full opportunity to respond. See *Dowda*, 341 Ga. App. at 299 (3); *Lowery*, 282 Ga. at 75 (4) (b) (ii).

However, "even error of a constitutional magnitude, such as an abridgment of the Sixth Amendment right to counsel, can be deemed harmless." *Lowery*, 282 Ga.

---

[2] In previous cases assessing this type of error, this Court has applied harmless error review, *Lowery*, 282 Ga. at 75-76 (4) (b) (ii); *Dowda*, 341 Ga. App. at 299 (3), and plain error review, *Murphy v. State*, 354 Ga. App. 560, 562 (2) (841 SE2d 153) (2020) (assuming without deciding that plain error applied).

at 75 (4) (b) (ii) (citation and punctuation omitted). "Whether a constitutional violation constitutes harmless error depends on whether the State can prove beyond a reasonable doubt that the error did not contribute to the verdict." Id. (citation and punctuation omitted). In this case, the State argues that the court's error did not affect the verdict, and we agree.

To reach this conclusion, we examine how we previously have handled this type of error. In some cases, where the trial court failed to disclose the full contents of a jury note to counsel and failed to seek any input from counsel in formulating the court's response to the jury, we have found harm and reversed convictions. See, e.g., *Dowda*, 341 Ga. App. at 298-299 (3) (jury note indicated that all six jurors had voted to acquit, but believed they were not unanimous because four jurors had voted not guilty and two jurors had voted innocent; judge instructed jurors to continue deliberating without input from the parties; we reversed for violation of defendant's right to counsel); *Wells v. State*, 297 Ga. App. 153, 158-160 (2) (676 SE2d 821) (2009) (jury sent note indicating that it was unanimous on some counts and not unanimous on others; trial court, without informing parties of the note or seeking any input, instructed the jury to continue deliberating; we reversed for violation of defendant's right to be present at a critical stage of the trial). In another case, where

11

the trial court failed to inform counsel of the contents of a jury note and seek input before responding to the jury, we deemed any such error to be harmless where it did not contribute to the verdict. *Lowery*, 282 Ga. at 72-73, 75-76 (4) (b) (ii) (jury note indicated that some jurors would not change their minds; trial court gave an *Allen* charge before discussing the note with counsel; because trial court had the discretion to give the *Allen* charge, the failure to consult with counsel did not affect the verdict).

Part of the harmless error analysis we have employed in prior cases includes an inquiry into what trial counsel would have done differently had the trial court not erred by failing to accurately disclose the contents of the jury note. See *Humphreys*, 287 Ga. at 77-78 (8) (a) (any error was harmless because defendant did not show "what different or further action he would have taken had the trial court read the [jury] note verbatim"). Here, trial counsel testified at the motion for new trial hearing that his response to the trial court's discussion of the jury note was based on his understanding that the jury had reached a unanimous verdict on four of the five counts. Counsel testified that, had he known the actual contents of the jury note, he would have suggested that the court respond "yes" to the jury's question as to whether they could be hung on one or more counts and vote guilty on others. Thus,

12

Zerbarini has shown that counsel would have acted differently had the trial court not failed to accurately convey the contents of the jury note.

However, given the record in this case, we conclude that counsel's proposed course of action would not have changed how the trial court instructed the jury and thus would not have changed the outcome of Zerbarini's trial. As the transcript shows, even while misunderstanding the contents of the jury note, trial counsel opposed giving the jury an *Allen* charge during the conference with the trial court. The State disagreed, and asked the court to give the *Allen* charge. The court ruled that it would first inquire with the foreman and proceed with the *Allen* charge if the foreman indicated that the jury was likely to be able to reach a unanimous verdict given more time. When questioned, the jury foreman without hesitation answered that he believed it was possible, so the court moved forward as intended, and gave the instructions to continue deliberating.

Further supporting our conclusion is that the trial court considered and rejected counsel's proposed response to the jury note. At the motion for new trial hearing, counsel stated that he would have encouraged the court to answer the jury's question—can we be a hung jury on one or more counts and convict on others—with a "yes." However, the court already considered doing this upon receipt of the note

13

and rejected the idea, because it would be inconsistent or confusing to both tell the jury that they could be a hung jury on some counts while also instructing them to continue deliberating in an attempt to reach a unanimous verdict on all counts. Therefore, it is clear that the court would have instructed the jury in the way that it did regardless of its error in failing to accurately communicate the contents of the jury's note to the parties. Indeed, under these circumstances, the trial court had the discretion to give the *Allen* charge, even if trial counsel had vigorously objected during the conference. See *Thornton v. State*, 145 Ga. App. 793, 794 (245 SE2d 22) (1978) ("The decision of whether to give a jury in disagreement the 'Allen' charge is generally left in the discretion of the trial judge."); *Honester v. State*, 336 Ga. App. 166, 171-172 (784 SE2d 30) (2016) (trial court has a duty to determine whether there is little or no possibility of the jury reaching a unanimous verdict before giving an *Allen* charge). We can thus be confident that the error did not contribute to Zerbarini's verdict in any meaningful way, and it was harmless beyond a reasonable doubt. See *Lowery*, 282 Ga. at 75-76 (4) (b) (ii).

(b) Zerbarini also asserts that the *Allen* charge given by the trial court in response to the jury note was incorrect and coercive. He argues that the instruction given omitted key language from a proper *Allen* charge that a unanimous verdict must

14

be based on the free and voluntary agreement of all of the jurors, and the trial court's brief mention of the impossibility of a unanimous verdict was insufficient "to cure the taint of the overall directive that a unanimous verdict must be reached on all counts if deliberations were to continue."

The State argues that we should review this claim for plain error because trial counsel did not object to the trial court's instruction, and we agree. Zerbarini argues that counsel did not have the requisite information to mount an objection to the instruction because he was misled by the court about the contents of the jury note. However, counsel clearly heard the court's instruction to the jurors, and admitted at the motion for new trial hearing that he believed it was not a "proper" instruction, yet he did not object. Where a party fails to object to a jury instruction, including an allegedly defective *Allen* instruction, we review for plain error. *Scott v. State*, 290 Ga. 883, 888 (6) (725 SE2d 305) (2012). Thus, we assess whether the *Allen* charge "was obviously erroneous, and if so, whether such error likely affected the outcome of the proceedings." Id. Satisfying the plain error standard "is difficult, as it should be." *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011) (citation and punctuation omitted).

15

As described above, a trial court is permitted to give an *Allen* charge when a jury indicates that it is unable to reach a unanimous decision. *Wells*, 297 Ga. App. at 160 (2). "The central inquiry in reviewing an *Allen* charge is whether the instruction is coercive so as to cause a juror to abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors." *Scott*, 290 Ga. at 888 (6) (citation and punctuation omitted).

Zerbarini is correct that the trial court's instruction to the jury in his trial was not a complete or correct *Allen* charge under Georgia law. Here, the trial court instructed the jury that it should "continue to work" and "it needs to be a unanimous verdict on each count." This instruction deviates significantly from the suggested pattern jury instruction for a hung jury, which provides carefully crafted language informing the jurors of their obligations to deliberate but to keep in mind the evidence and the arguments of the other jurors. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (2018), § 1.70.70 (Hung Jury) (including specific language that the "verdict must be the conclusion of each juror and not a mere acquiescence of the jurors in order to reach an agreement"). However, any coercive effect of the court's instruction that the verdict needed to be unanimous was offset because the court explicitly left open the possibility of continued disagreement from the jurors, stating

16

that "[i]f you reach a point . . . that you think it is impossible," to then inform the court, which would explore "the options at that time." Therefore, any error in the court's instruction was not obvious. See *Dukes v. State*, 290 Ga. 486, 489 (5) (722 SE2d 701) (2012) (finding no error, much less plain error, where charge regarding the unanimity of the verdict viewed as a whole was proper).

Additionally, we agree with the State that the jury's note, asking whether it could be a hung jury on one or more counts, was not an announcement that the jury was deadlocked, especially when considered in conjunction with the foreman's response to brief questioning by the trial court that he believed that the jury could reach a unanimous verdict on every count if given more time. See *Hampton v. State*, 302 Ga. 166, 167-169 (2) (805 SE2d 902) (2017) (jury's note asking whether it "needed to vote unanimous on guilty or not guilty on a specific charge" was not an announcement that the jury was deadlocked) (punctuation omitted). And, as our Supreme Court has recognized, "a jury that is not deadlocked is less susceptible to coercion than a deadlocked jury." Id. at 168 (2). Thus, Zerbarini has also not carried his burden to show that any error probably did affect the outcome below. See id. at 169 (2) (concluding that, because the jury was not deadlocked, the court's instruction concerning the unanimity of the verdict did not probably affect the outcome).

17

Here, where the evidence against Zerbarini was strong, including the testimony of the two victims named in the indictment, as well as testimony from three additional victims and an eye witness to act of child molestation by Zerbarini, and where the record does not reliably suggest that the jury was deadlocked, we find that Zerbarini fails to meet "the burden of persuasion with respect to prejudice" or affirmatively show "that the error probably did affect the outcome below." *Hampton*, 302 Ga. at 169 (2) (citation and punctuation omitted).

(c) Alternatively, Zerbarini contends that counsel was ineffective for failing to object to the incorrect and coercive *Allen* charge. However, for the reasons stated above, we find that the jury instruction did not amount to error and thus it "cannot form the basis of a claim of ineffective assistance of counsel." *Scott*, 290 Ga. at 890 (7) (d); see also *Hampton*, 302 Ga. at 168-169 (2) (equating prejudice prong of plain error analysis to prejudice prong of ineffective assistance of counsel analysis).

2. Zerbarini next asserts that the trial court erred by failing to give a curative instruction to the jury after a witness improperly bolstered the credibility of another witness. Specifically, Zerbarini is referring to testimony from P. B., the father of the victim, M. B.

P. B. was the first witness called at trial. During direct examination, P. B. testified about the positive relationship he had with his neighbors, the Zerbarinis. Both families had children who would play together. On August 2, 2014, Zerbarini's wife, Lynne, informed P. B. that Zerbarini was under investigation for child molestation, and encouraged P. B. to have M. B. "[c]hecked out." P. B. told his wife, and the two decided to ask their daughters if Zerbarini had hurt them. Their younger daughter had no reaction, but M. B.'s face began to "well up," and she told her parents Zerbarini had touched her under her pants. From there, P. B. reported the outcry to the police and cooperated with the investigation.

On cross-examination, Zerbarini's trial counsel asked P. B. several questions about whether he was influenced by Lynne's report that Zerbarini was under investigation for child molestation against the Zerbarini daughters and possibly other children in the neighborhood. Trial counsel asked whether P. B. had already made up his mind that Zerbarini molested M. B. before he and his wife questioned M. B. P. B. described that, after the outcry, M. B. became fearful of being alone and more nervous. Trial counsel questioned him about sending an e-mail to the detective asking for an update, and P. B. responded that he was worried for his daughter because Zerbarini was not in custody and he feared that she was being affected by seeing him

around the neighborhood. Specifically, during this exchange, P. B. stated: "You know, from what I gathered, what my daughter told me was true; I had no other reason to believe that she was wrong – lying to me when she disclosed that [Zerbarini] did those things to [her]." P. B then stated that he was trying to protect his daughter, and the cross-examination ended.

After the cross-examination, an unreported bench conference was held. Later that day, Zerbarini's trial counsel explained the substance of the bench conference as follows: "I asked the [c]ourt for a curative instruction to the jury because one witness cannot testify, in Georgia, that they believe another person was telling the truth. That's improper bolstering." Counsel asked that the record reflect that the court denied his request. Zerbarini now raises this denial as trial court error. He argues that the trial court's failure to give a curative instruction to the jury harmed him because the credibility of the victim, M. B., was central to his convictions given the lack of other corroborating evidence.

"A witness'[s] credibility may not be bolstered by the opinion of another, even an expert, as to whether the witness is telling the truth. Credibility of a witness is a matter solely within the province of the jury." *Blackmon v. State*, 336 Ga. App. 387, 394 (2) (b) (785 SE2d 59) (2016) (citation and punctuation omitted). However, trial

counsel's failure to contemporaneously object to P. B.'s alleged bolstering testimony prevents us from addressing the merits of the issue on appeal.[3] See *Bridges v. State*, 279 Ga. 351, 356 (9) (613 SE2d 621) (2005) (failure to contemporaneously object to testimony waived the issue on appeal); *Torres v. City of Jonesboro*, 354 Ga. App. 874, 876 (2) (842 SE2d 75) (2020) (reiterating the "contemporaneous objection rule" under Georgia's updated evidence code). Thus, we find no reversible error based on the court's denial of Zerbarini's request for a curative instruction.

3. Zerbarini asserts that trial counsel was ineffective for three reasons: (a) failing to preserve the bolstering objection to P. B.'s testimony discussed in Division 2; (b) failing to subpoena Lynne Zerbarini as a witness; and (c) failing to lay a proper foundation to admit the forensic interviews of three of the testifying victims. He argues that the evidence against him was not overwhelming, so he was prejudiced by these failures of counsel.

To prevail on any of these claims, Zerbarini must prove both that his lawyer's performance was deficient and that he suffered prejudice as a result of this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80

---

[3] Zerbarini argues in the alternative that trial counsel was ineffective for failing to make a timely objection to P. B.'s testimony at trial. Zerbarini's ineffectiveness claims are discussed in Division 3.

21

LE2d 674) (1984). "If [Zerbarini] cannot meet his burden of proving either prong of the *Strickland* test, then we need not examine the other prong." *Causey v. State*, 319 Ga. App. 841, 842 (738 SE2d 672) (2013). "The trial court's determination that an accused has not been denied effective assistance of counsel will be affirmed on appeal unless that determination is clearly erroneous." *Johnson v. State*, 214 Ga. App. 77, 78 (1) (447 SE2d 74) (1994) (citations and punctuation omitted).

With respect to the first prong of the *Strickland* test, deficient performance, Zerbarini must show that his attorney performed his duties at trial in an objectively unreasonable way, considering all the circumstances, and in light of prevailing professional norms. *Strickland*, 466 U. S. at 687-688 (III) (A).With respect to the second prong of *Strickland*, to demonstrate that he suffered prejudice as a result of trial counsel's performance, Zerbarini must prove "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694 (III) (B). "This burden, though not impossible to carry, is a heavy one." *Arnold v. State*, 292 Ga. 268, 270 (2) (737 SE2d 98) (2013), citing *Kimmelman v. Morrison*, 477 U. S. 365, 382 (II) (C) (106 SCt 2574, 91 LE2d 305) (1986).

(a) Zerbarini argues that counsel was ineffective for failing to make a timely objection to P. B.'s testimony allegedly bolstering M. B.'s credibility, arguing that he was prejudiced because the victim's credibility was central to the issue of his guilt due to the lack of corroborating evidence. We disagree.

First of all, we do not find that the complained-of testimony was highly prejudicial to Zerbarini, even if in error. See *Thomas v. State*, 318 Ga. App. 849, 854 (4) (a) (734 SE2d 823) (2012) (effect of bolstering should be viewed in context of all the evidence to determine if it had an effect on the outcome on the trial). The jurors were able to hear from M. B. and judge her credibility for themselves, not only through her trial testimony, but also through the recording of her forensic interview which they viewed more than once. Thus, "the State presented other evidence from which the jury could assess [M. B.'s] credibility," minimizing any prejudicial effect of P. B.'s alleged bolstering. *Dority v. State*, 335 Ga. App. 83, 93 (2) (780 SE2d 129) (2015). The jury also heard Dr. Bruck's opinion on the credibility of M. B.'s account, when Dr. Bruck called the child's narrative "bizarre" and stated that she could not understand how the molestation could have happened as M. B. reported it. Additionally, the fact that a father believes that his daughter is telling the truth is neither surprising nor damning to the defendant. See *Rozier v. Caldwell*, 300 Ga. 30,

23

34 (4) (793 SE2d 73) (2016) (bolstering testimony unlikely to be harmful because it is not surprising that law enforcement would believe the victim's account, "and any rational juror could have surmised as much without being told explicitly") (citation and punctuation omitted). Finally, there was other significant evidence of Zerbarini's guilt, including the testimony of other victims and witnesses. See *Gaston v. State*, 317 Ga. App. 645, 647-649 (1) (731 SE2d 79) (2012) (strength of other evidence against defendant is critical to our examination of the harm of bolstering testimony). Thus, we conclude that it was unlikely that the bolstering testimony had much, if any, effect on the verdict.

Further, P. B.'s testimony that he believed that M. B. was telling him the truth not only was elicited by trial counsel, but strengthened the defense's theory at trial. Trial counsel had spent the cross-examination of P. B. building the theory that P. B., influenced by Lynne, had already made up his mind that Zerbarini had molested his daughters. Thus, P. B. might have influenced M. B. to make a false allegation during his questioning of her.

Indeed, that P. B. believed that Zerbarini was guilty before questioning M. B. was also central to a line of questions later asked by trial counsel to Dr. Bruck, Zerbarini's expert witness. Trial counsel asked Dr. Bruck whether it was significant

24

that M. B.'s outcry was elicited by her father. Dr. Bruck explained that P. B. "doesn't seem to give [ ] a possibility that it didn't happen; [P. B.] already seems to think that it happened." She went on to explain why P. B.'s mindset of prejudged guilt would have influenced how he questioned his daughter, and how such questioning could have elicited false allegations from the child.

Based on the circumstances in which P. B. provided his testimony, and based on the testimony elicited during the trial as a whole, we cannot find that trial counsel's failure to object and preserve the bolstering issue for appeal amounts to ineffective assistance. Where trial counsel has chosen a defense theory advancing the idea that one witness pre-judged the defendant to be guilty, the fact that such witness testified that he believes the victim does not prejudice the defendant. See *Davis v. State*, 306 Ga. 140, 148 (3) (g) (829 SE2d 321) (2019) (no deficient performance where trial counsel used witness's bolstering of victim's credibility to the defendant's advantage); *Heard v. State*, 204 Ga. App. 757, 759 (4) (420 SE2d 639) (1992) ("A party will not be heard to complain of error induced by his own conduct.") (citation and punctuation omitted). Even if the trial court had issued a curative instruction after P. B.'s testimony, as Zerbarini desired, Dr. Bruck's testimony would have again put the same issue before the jury, diminishing the effect of any prior instruction. See

*Bridges*, 279 Ga. at 356 (8) (no harm where complained of testimony was cumulative of separate and admissible testimony). Thus, for all of these reasons, Zerbarini has failed to show prejudice for this claim of ineffective assistance of counsel.

(b) Zerbarini asserts that counsel was ineffective for failing to subpoena Lynne as a defense witness during trial. He states that Lynne was available and would have been a critical witness for the defense, in that her testimony would have supported the defense theory that, through her intense suspicion and anger toward Zerbarini, she influenced all of the other victims into fabricating allegations against Zerbarini.

Lynne testified at the motion for new trial hearing. The only specific testimony that Zerbarini points to in support of his claim that Lynne could have affected the outcome of the trial concerns Lynne's account of her initial report to the police. In her testimony and written statement to police, Lynne reported that her daughter T. Z. made a specific outcry of abuse in March or April of 2014. She did not initially report this outcry to anyone because she was "scared that [her] whole life would be destroyed."

However, in July 2014, after hearing from her brother that her niece, Z. S., had accused Zerbarini of molesting her, Lynne questioned T. Z. directly about whether Zerbarini had molested her. T. Z. stated that "Daddy licked my toilet spot," and

26

mimicked what her father did to her. Lynne testified that she reported this specific outcry to police. However, Officer Christopher Judy testified at the motion for new trial hearing that Lynne never reported any specific outcry from T. Z.; Lynne reported merely that she was suspicious of Zerbarini and "gave no evidence why [Zerbarini] is a suspect other than him watching after their children and that [Zerbarini] 'creeps [Lynne] out.'" Zerbarini argues that this evidence would have "impeached" T. Z.'s testimony, yet was not presented to the jury due to counsel's failure to subpoena Lynne and Officer Judy as witnesses. At the motion for new trial hearing, trial counsel testified that he did not subpoena Lynne or Officer Judy because he believed that the State would call them as witnesses.

We conclude that Lynne's testimony would not have affected the outcome of the trial. Contrary to Zerbarini's claim, the defense theory that Lynne potentially influenced the victims or their parents into inventing allegations against Zerbarini was presented throughout the trial, including in cross-examinations of the victims, in Zerbarini's testimony, and especially in Dr. Bruck's testimony. In fact, the defense theory was likely strengthened by the fact that the jury never heard from Lynne, as

it is unlikely that she would have admitted to encouraging any false allegations.[4]

Further, although Lynne's credibility may have been affected by inconsistent testimony,[5] it is unclear how Lynne's inconsistent testimony would have impeached T. Z., who testified at trial that her father molested her on multiple occasions and that no one had ever encouraged her to give a false account of what happened to her. In any event, when and how Lynne reported the incident to the police is not central to the issue of Zerbarini's guilt. See *Meadows v. State*, 264 Ga. App. 160, 165 (4) (c) (590 SE2d 173) (2003) (to show ineffective assistance of counsel for failure to subpoena a witness, defendant must show that the uncalled witness would have benefitted the defendant's case); *Lynch v. State*, 293 Ga. App. 858, 862 (2) (668 SE2d

---

[4] To the contrary, Lynne's testimony at the motion for new trial hearing was full of details that would have been damaging to Zerbarini's defense, which is likely why trial counsel "did not imagine that the State wasn't going to call her to testify." Specifically concerning whether she influenced T. Z. into accusing her father, Lynne testified that T. Z.'s very first accusation against Zerbarini occurred in March 2014, and was "out of the blue" and not in response to her questioning the girl. Lynne also testified that, after hearing additional allegations from family members, she called a sexual abuse hotline for advice on how to talk to her children about potential abuse from their father before proceeding.

[5] Further, it is not even clear that Lynne's testimony was inconsistent with her written statement and Officer Judy's report in the way that Zerbarini claims. Although Lynne stated that she reported T. Z.'s outcry to police, she also stated that she did not report everything to the police on the first day, and admitted that she did not report specifics for fear that she would look like a bad mother.

28

264) (2008) (no prejudice where facts that would have been testified to by uncalled witnesses were not central to the State's case). Under these circumstances, Zerbarini has not shown prejudice for counsel's failure to call Lynne as a witness.

(c) Zerbarini asserts that trial counsel was ineffective for failing to secure witnesses that could lay the foundation for admission of the videos of forensic interviews with three of the testifying victims. Although M. B.'s forensic interview was shown to the jury, the interviews with other victims, T. Z. (Zerbarini's daughter), A. Z. (Zerbarini's other daughter), and Z. S. (Zerbarini's niece), were not. At trial, Zerbarini's counsel explained that he wished to admit these forensic interviews, as he believed they were critical to the defense's case. The interviews were conducted in New York state, however, and trial counsel had not subpoenaed the interviewers to ensure their presence. The trial court excluded the interviews for failure to present a witness to lay a proper foundation, as well as for failure to provide notice to the State for use of the Child Hearsay Statute. At the motion for new trial hearing, trial counsel explained that he did not subpoena the forensic interviewers to lay a foundation for the videos because he believed the State would call them as witnesses and he would have an opportunity to cross-examine them.

Zerbarini states that these videos "were critical to [Zerbarini's] defense because they documented how T. Z. as well as the other act witnesses would have been impeached," without providing any specific information from the videos that contradicts anything in the witnesses' testimonies. And, although Zerbarini cites to portions of the motion for new trial hearings where trial counsel explained how he thought he could have used the videos to Zerbarini's advantage, he makes no citations to any specific time stamps in the videos themselves,[6] or to any trial testimony from any of the witnesses to support his argument that the videos could have been used to impeach the victims. We find that this claim therefore fails as conclusory and unsupported by citations to the record. See *Brittain v. State*, 329 Ga. App. 689, 704 (4) (a) (766 SE2d 106) (2014) (argument deemed abandoned which includes "mere conclusory statements") (citation and punctuation omitted); Court of Appeals Rule 25 (c) (2) (i) (enumerated errors must be supported in the brief by specific reference

---

[6] In any event, although a thumb drive containing the three forensic interviews and transcripts of the interviews were provisionally admitted at the motion for new trial hearing as defendant's Exhibits ## 1-4, no such thumb drive or transcripts appear in the appellate record. To the extent that the record is somehow incomplete, Zerbarini as the appellant bears the burden of ensuring an accurate and complete record on appeal. See *Crawford v. State*, 288 Ga. 425, 427 (2) (a) (704 SE2d 772) (2011).

to the record; in the absence of such citations, "the Court will not search for and may not consider that enumeration").

4. Zerbarini asserts that the trial court erred in failing to merge the sentences for Counts 1 (aggravated child molestation) and 2 (incest), involving T. Z., for sentencing purposes. We disagree.

Whether two offenses merge is a question of law, which we review de novo. *Womac v. State*, 302 Ga. 681, 684 (3) (808 SE2d 709) (2017). In order to determine whether two crimes involving different statutory provisions merge, "we apply the 'required evidence' test to assess whether each offense requires proof of a fact which the other does not." *Hall v. State*, 313 Ga. App. 66, 68 (720 SE2d 181) (2011) (citation and punctuation omitted).

We have held that the offenses of aggravated child molestation and incest do not merge because they have different elements. *Jones v. State*, 333 Ga. App. 796, 802 (4) (777 SE2d 480) (2015). "Child molestation requires proof that the victim was younger than 16; incest requires proof of consanguinity, and these required elements do not overlap." Id. Here, Count 1 required evidence that Zerbarini acted with the intent to arouse and satisfy his sexual desires by licking the genitals of T. Z., and Count 2 alleged that Zerbarini was related to the victim by blood. Because these

required elements do not overlap, the two offenses were not subject to merger. See id. at 801 (3) (offenses of statutory rape and incest also did not merge under required evidence test).

Additionally, T. Z. testified that Zerbarini licked her genitals on more than one occasion. Specifically, T. Z. was asked: "Did it happen just one time?" and she responded" No, [m]ore than one." Thus, even if the elements of Counts 1 and 2 overlapped, they could have been based on separate incidents and were not subject to merger. See *Wilder v. State*, 304 Ga. App. 891, 895 (4) (698 SE2d 374) (2010), reversed on other grounds by *Wilder v. State*, 290 Ga. 13, 16-17 (2) (717 SE2d 457) (2011) (where defendant had sexual intercourse with victim on multiple occasions, it could not be said that convictions for child molestation and statutory rape were based on the same conduct).

5. Finally, Zerbarini asserts that a conflict of interest or the appearance of impropriety on the part of the trial judge requires reversal of his convictions. The Prosecuting Attorneys' Council of Georgia responded on behalf of the State on this claim. We find no reversible error.

The Georgia Code of Judicial Conduct states that judges must avoid all impropriety and the appearance of impropriety. Commentary to Canon 2 of the Code

of Judicial Conduct. "The test for the appearance of impropriety is whether the situation would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." *In the Matter of: Inquiry Concerning a Judge No. 97-61*, 269 Ga. 425, 425 (499 SE2d 319) (1998) (citation omitted). Additionally, judges are required to disqualify themselves in any proceeding in which their "impartiality might reasonably be questioned." Canon 3 (E) of the Code of Judicial Conduct; *State v. Wakefield*, 324 Ga. App. 587, 593 (2) (b) (751 SE2d 199) (2013).

The Honorable Judge Robert "Mack" Crawford presided over Zerbarini's trial. Zerbarini's trial took place from December 4, 2017, through December 15, 2017. On December 11, 2017, at Judge Crawford's request, the Pike County Clerk of Superior Court, Carolyn Williams, issued a check payable to Judge Crawford out of the Pike County registry funds. At the motion for new trial hearing, Judge Crawford stated that he did not receive the check until December 14, and the record shows that Crawford deposited the check on December 15. This check would later become the subject of a criminal indictment against Judge Crawford for charges of theft by taking and violation of oath by a public officer.

Zerbarini claims that Judge Crawford knew he had acted criminally, and "did not want to do anything to cause the prosecutors to become upset with him." However, at the motion for new trial hearing, Judge Crawford denied any wrongdoing. Further, Judge Crawford testified that he was not biased in favor of the State, made no rulings in order to curry favor with the State, and had no fear of prosecution during Zerbarini's trial. As evidence of the judge's conflict of interest, Zerbarini points to his counsel's belief that Judge Crawford "felt pressured to rule in the prosecution's favor on certain issues," and "there was something going on" during trial that counsel was not privy to between Judge Crawford and the prosecution. However, trial counsel also admitted that he did not believe that Judge Crawford was biased against Zerbarini during the trial, which is why he never sought recusal.

Given these circumstances, where the trial judge denies wrongdoing and any bias, trial counsel admitted he did not believe the trial judge was biased and did not seek recusal, and there is no evidence of actual impropriety, we cannot conclude that reasonable minds would find that Judge Crawford suffered from an appearance of impropriety such that he could not carry out his judicial responsibilities during Zerbarini's trial. See *Wilson v. McNeely*, 295 Ga. App. 41, 42 (1) (670 SE2d 846) (2008) (stating test for appearance of impropriety). We therefore find no reversible

error. See *Hargrove v. State*, 299 Ga. App. 27, 31-32 (2) (681 SE2d 707) (2009) ("A trial judge's failure to sua sponte recuse himself will warrant reversal only where the conduct or remark of the judge constitutes an egregious violation of a specific ethical standard, and it must support the inescapable conclusion that a reasonable person would consider the judge to harbor a bias that affects his ability to be impartial.") (citation and punctuation omitted).

*Judgment affirmed. Barnes, P. J., and Pipkin, J., concur*.