[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 20-12393

_____

ETHAN JAMES CHARLES,

Plaintiff-Appellant,

*versus*

JEFF JOHNSON,
individually and in his official capacity as Sheriff
of Dawson County,
WILLIAM THACKER,
CHARLES BRANTLEY,
RYAN LECKIE,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 2:18-cv-00101-RWS

_____

Before WILLIAM PRYOR, Chief Judge, LAGOA, Circuit Judge, and WATKINS,* District Judge.

WATKINS, District Judge:

After midnight on July 8, 2016, Appellant Ethan Charles was arrested by Appellee William Thacker, a Dawson County Sheriff's Deputy. Charles, who claims to suffer from bipolar disorder and panic attacks, resisted this arrest for over five minutes. Deputy Thacker only succeeded in subduing Charles with the aid of Appellee Ryan Leckie—a civilian bystander—and Appellee Charles Brantley—a second Sheriff's Deputy. Charles was convicted of felony obstruction of a law enforcement officer in a Georgia state court. He then brought suit against the individual Appellees under 42 U.S.C. § 1983 in the United States District Court for the Northern District of Georgia, alleging excessive force under the Fourth and Fourteenth Amendments to the United States Constitution. Charles also brought related state law claims against the individual Appellees. Additionally, Charles sued the Dawson County Sheriff,

_____

* Honorable W. Keith Watkins, United States District Judge for the Middle District of Alabama, sitting by designation.

alleging that a failure to accommodate Charles's disability constituted a violation of the Rehabilitation Act.

The district court granted summary judgment in favor of Defendants on all federal claims and declined to exercise supplemental jurisdiction over the pendent state claims. For the reasons stated below, we affirm.

I

On the night of the traffic stop, Charles was one of four passengers in a red Ford Mustang stopped for speeding by Deputy Thacker, who was on patrol alone. Charles was a passenger in the front seat. The car stopped at a well-lit gas station next to an island of gas pumps. Deputy Thacker parked to the rear and slightly to the right of the stopped car. Dash cameras in Deputy Thacker's vehicle and, later, in Deputy Brantley's vehicle, recorded all of the incident on audio and most of the incident on video.

After collecting the occupants' identification, Deputy Thacker discovered that Charles had an outstanding warrant. Charles was unaware of the warrant. When asked by Deputy Thacker to step out of the vehicle, Charles exited with a cell phone to his ear. Deputy Thacker told Charles four times to hang up the phone and told Charles that he would have an opportunity to call the person back later. Before making physical contact, Deputy Thacker also told Charles twice to put his hands behind his back. Charles ignored the requests and orders of the deputy. Eventually, after Charles continued to ignore the deputy and move away from

him, Deputy Thacker reached for Charles, who pulled his arms away from the deputy's reach.  Deputy Thacker told him to place his hands behind his back five more times and then told him:  "I'm about to tase you.  Hands behind your back!  I'm about to tase you."  Deputy Thacker once again told Charles to put his phone down and, as Charles continued to struggle and shout, told him:  "Ethan—you're gonna get tased, Ethan!  Stop!  Put the phone down!"

The struggle moved off-video, where Appellee Ryan Leckie, a bystander, is heard asking, "Sir, can you get a cuff on him?"  Leckie assisted Deputy Thacker by restraining Charles in what Charles has described as a "chokehold."  Leckie testified that he instead used a "full nelson."  Deputy Thacker told Charles to put his hands behind his back two more times while Charles continued yelling at Thacker.  While off-video, Deputy Thacker tackled Charles and brought him to the pavement.[1]

---

[1] Where video evidence is conclusive, witness testimony cannot be used to introduce a factual dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).  However, the dashcam video does not show how Charles and Deputy Thacker reach the ground.  An eyewitness, in an *ex parte* affidavit to Charles's counsel, stated that Deputy Thacker "body slammed" Charles to the pavement, with Charles's head "hit[ting] the ground at least twice."  The contents of this affidavit, however, were not disclosed to Defendants until after the eyewitness was deposed.  In her deposition, the eyewitness instead agreed that Deputy Thacker "tackle[d]" Charles. Under Federal Rule of Evidence 613, the affidavit would only be admissible at trial for impeachment purposes.  With no substantive admissibility, Charles cannot rely on any statements in the affidavit at the summary judgment stage.  *See Santos v. Murdock*, 243 F.3d 681, 684 (2d

20-12393               Opinion of the Court                    5

Charles's yelling could be clearly heard through the radio in Deputy Brantley's patrol car as he approached the scene, as well as on the audio recording from Deputy Thacker's vehicle. When Deputy Brantley arrived at the scene, Deputy Thacker, Leckie, and Charles were seen struggling on the pavement, with Charles at the bottom of the pile. Charles was lying on his side, with Deputy Thacker kneeling on or near Charles's hips and Leckie pressing his upper body into Charles's chest and neck. Leckie's left elbow was pressed into either the side or back of Charles's neck while Leckie's right arm restrained Charles's right arm. As Deputy Brantley exited his vehicle and approached the scrum, his hand reached to his belt and drew his taser. With taser in hand, Brantley knelt down near Charles's chest.

Deputy Brantley told Leckie to "get behind" him. Leckie stood up and backed away. Deputy Brantley told Charles, "You move and I will tase you. You got me? Got it?" Brantley repeated,

---

Cir. 2001). The deposition testimony of the eyewitness, and not her pre-deposition affidavit, is controlling.

Other disputes surround the exact details of this tackle. Deputy Thacker was not asked about the takedown in his deposition, and his affidavit only says: "[Leckie] and I eventually got [Charles] on the ground . . . ." Charles testified that he has no memory of how he was brought to the pavement. Leckie's version is inconsistent with the eyewitness's version: "We fell. . . . I mean, we got tangled up in each other's feet, I believe, because [Thacker] was trying to handcuff when [Charles] was flailing around." Because there is a material dispute of fact, we take the version most favorable to Charles and assume that Deputy Thacker tackled Charles.

"Move, and you will get tased.  You got it?"  Charles replied "yes sir" four times.  Sometime during the melee, Charles was initially handcuffed.  However, because of Charles's erratic movements and awkward position on the ground, Charles's arms were cuffed in the front of his body.

While Deputies Thacker and Brantley discussed how to move Charles to reposition the cuffs to the back, Charles attempted to lift himself up off the pavement.  One of the deputies told him: "Do it.  I'm fixin' to tase you.  Do it.  Do it.  Move again.  Move again and I will tase you."  Charles continued yelling and arguing. Deputy Brantley told Charles:  "We gone [sic] put these cuffs on the back of you.  You move, I will tase you.  You got it?"

As Deputies Thacker and Brantley attempted to readjust Charles, Charles again raised his body off the pavement.  Deputy Brantley told him to get on the ground four times.  Charles replied, "I can't. I can't moves [sic] up my leg."  While on the pavement, the deputies were unsuccessful in gaining control over Charles's hands to recuff him, as Charles "had his hands pulled into his body and would not relax his hands."  After more seconds of Charles's screaming and struggling, Brantley said:  "I do not want to tase you."  Charles replied:  "I don't wanna get tased."

In an attempt to get the handcuffs to the back of Charles, Deputy Brantley removed the cuffs and began to instruct Charles: "Put, put your hands up here in the front. Put your hand in the front or you can des— (inaudible)."  At this point Charles raised his body off the pavement for a third time, first getting onto his knees

and then pushing up onto his hands and feet. Deputy Brantley pressed his taser into the right side of Charles's back, and the taser audibly engaged. As Charles fell to the ground, the sound of the taser briefly stopped, resuming shortly after Charles reached the pavement. Brantley remarked: "I told you I didn't wanna tase you." The taser was deployed for five seconds in the "drive stun" mode, a less potent application of the taser device that is only intended to stun the target.

On the pavement, Charles continued struggling and yelling. Brantley told him: "Stop. Do it again. Do it again, I will tase you again. You got it?" After Deputies Thacker and Brantley both warned Charles that he would get tased again, the officers managed to recuff him in the back and move him into Thacker's patrol car. In the patrol car, Charles continued shouting and thrashing about, and he began beating his head against the metal partition in the patrol car. Sixteen staples were needed to treat Charles's self-inflicted head injuries.

Charles was arrested and charged with felony obstruction under Georgia law. He was accused of "unlawfully knowingly and willfully resist[ing] and oppos[ing] Deputy William Thacker, a law enforcement officer in the lawful discharge of his official duties, by offering violence to such officer by resisting a lawful arrest, pulling away, slamming his head against Deputy Thacker's patrol vehicle, and screaming at and fighting with said officer . . . ." Charles pleaded guilty and was sentenced as a first offender.

## II

We review an order granting summary judgment *de novo*. *Yarbrough v. Decatur Hous. Auth.*, 941 F.3d 1022, 1026 (11th Cir. 2019). To obtain summary judgment, the movant must show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The facts are construed in the light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

We will first address the § 1983 claim against the civilian bystander, Appellee Ryan Leckie. Next, we will address the deputies' qualified immunity. Finally, we will consider Charles's claim against the Sheriff under the Rehabilitation Act.

## III

Charles's federal claim against Leckie, the bystander, alleges that Leckie used excessive force against Charles in violation of the Fourth and Fourteenth Amendments. The Supreme Court has held that the Fourth Amendment applies only to governmental actions. *See Burdeau v. McDowell*, 256 U.S. 465, 475 (1921). The Fourteenth Amendment, by its own language, applies solely to state action. *See* U.S. CONST. amend. XIV, § 1 ("No State shall . . . ."). These constitutional rights are enforceable in federal court through § 1983, which creates a private right of action against those who violate the rights of others while acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia . . . ." 42 U.S.C. § 1983. The

requirement that the deprivation be made "under color of state law" means that the deprivation must be made by a state actor. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982) ("[I]n a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical."); *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1276–77 (11th Cir. 2003). The state action requirement is an element of a § 1983 claim that the plaintiff must prove in order to prevail. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999).

In order to meet the state action requirement, the conduct at issue must be "fairly attributable" to the state:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible. . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.

*Lugar*, 457 U.S. at 937. Supreme Court precedent has solidified three situations where private entities can be considered state actors:

> (1) the State has coerced or at least significantly encouraged the action alleged to violate the Constitution ("State compulsion test"); (2) the private parties

performed a public function that was traditionally the exclusive prerogative of the State ("public function test"); or (3) the State had so far insinuated itself into a position of interdependence with the private parties that it was a joint participant in the enterprise ("nexus/joint action test").

Rayburn ex rel. Rayburn v. Hogue, 241 F.3d 1341, 1347 (11th Cir. 2001) (quoting Nat'l Broad. Co. v. Commc'ns Workers of Am., AFL-CIO, 860 F.2d 1022, 1026 (11th Cir. 1988)) (cleaned up); see also Lugar, 457 U.S. at 939.

## A

We must first address a procedural issue. Leckie did not specifically raise lack of state action as a defense in either his *pro se* Answer or his counseled Motion for Summary Judgment. The issue was not addressed until the Magistrate Judge raised and analyzed it in his Report and Recommendation. Charles objected to the Report and Recommendation, arguing that Leckie had waived the defense.

We resolved this issue in *Almand v. DeKalb County*, 103 F.3d 1510 (11th Cir. 1997). In *Almand*, the plaintiff was assaulted by a police officer while the police officer was not actively engaged in the performance of his official duties. The plaintiff sued the police officer under 42 U.S.C. § 1983 and included in her complaint an allegation that the police officer was acting "under color of state law." *Id.* at 1513. The answer admitted the facts alleged in that

paragraph, but the police officer raised the issue at summary judgment. In our words: "[C]onstruing [the officer's] answer to [the allegation] as a binding admission of the color-of-state-law element would violate Fed. R. Civ. P. 8([e])'s mandate to construe all pleadings in a way that does 'substantial justice.'" *Id.* at 1514. In allowing the late-raised defense, we noted that the pleadings and summary judgment motion were sufficient to put the plaintiff on notice that state action was a contested issue. *Id.*

A motion for summary judgment is not a *sui generis* method for preserving a defense. Instead, the motion in *Almand* was important because it gave the plaintiff pre-trial notice of the defense and an opportunity to respond. Here, Charles received substantially the same notice and opportunity to respond when the Magistrate Judge raised the issue in his summary judgment recommendation. Charles had the opportunity to (and did) file objections to the Report and Recommendation, fully briefing the issue for the District Judge.

To salvage his claim of waiver, Charles cites *Sinclair Refining Co. v. Howell*, 222 F.2d 637 (5th Cir. 1955).[2] Charles then cites *Williams v. Aguirre*, 965 F.3d 1147 (11th Cir. 2020), presumably to argue that the prior panel decision—*Sinclair*—should be binding over the later panel decision—*Almand*. However, *Williams*

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted all decisions of the former Fifth Circuit handed down before the close of business on September 30, 1981, as precedent for this court.

20-12393                Opinion of the Court                12

instructs us to make every attempt to reconcile the two decisions and to apply the reconciled rule. We are compelled to disregard the later decision only when a synthesis is impossible.

Sinclair was a wrongful death suit. 222 F.2d at 638. Under Alabama law, the coverage of workers' compensation laws was an affirmative defense to an employee's suit, and a plaintiff in an employer-employee relationship had to state in his complaint whether such compensation laws applied. The plaintiff in Sinclair alleged that no such coverage existed. The defendant did not expressly deny this averment in its answer but moved for a directed verdict at trial, claiming that such coverage did exist. Id. at 639. The Fifth Circuit held that the failure to deny the allegation in the answer was an admission, and the court emphasized that, had the issue been properly presented, the plaintiff would have been able to conduct discovery on the issue. Because the issue was raised at the directed verdict stage (now called judgment as a matter of law, see FED. R. CIV. P. 50), the plaintiff in Sinclair lost not only the opportunity to conduct discovery on the issue, but also the opportunity to present evidence on the issue in his case-in-chief. Id. at 640.

With Sinclair and Almand, a synthesized rule is fairly straightforward: A failure to deny is generally an admission, but the court can refuse to make this interpretation in order to do substantial justice. The court should look at the prejudice to the plaintiff, taking into account the amount of pre-trial notice and the sufficiency of existing discovery for responding to the defense. An affirmative defense, such as the defense in Sinclair, involves by

nature the introduction of facts beyond those relevant to the elements of the claim. Thus, prior discovery and notice are less likely to be sufficient for responding to unexpected affirmative defenses.

This synthesized rule provides an easy resolution to the issue before us. State action is an element of a § 1983 claim, not an affirmative defense, *see Sullivan*, 526 U.S. at 49–50; when Leckie's lack of state action was raised by the Magistrate Judge, Charles had a pre-trial opportunity to respond to the argument; and, lastly, Charles has not identified any further discovery that would have been needed to respond to the argument. Thus, all the factors discussed in *Sinclair* and *Almand* encourage us to entertain Leckie's defense, even at the later stage that it was raised.

Moreover, with the liberal interpretation of waiver stated in *Almand*, coupled with our usual rule requiring the liberal interpretation of *pro se* pleadings, *see Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017), we cannot say that Leckie waived his state action defense in his Answer. In his *pro se* Answer, Leckie said that he "cannot speak on counts 1-14," the counts against him. He stated that, "I feel I am not in any way liable for any of this man[']s ALLEGED injuries or issues," and he maintained that he could not be sued because he was "a civilian." Leckie concluded, "I don[']t feel I did anything malicious, criminal, or that would merit legal or financial recourse." This language, under our rules of liberal construction, sufficiently notified Charles that state action was at issue in this case and sufficiently preserved Leckie's defense.

### B

Of the three broad tests for state action, only the "nexus/joint action test" is adequately argued by Charles.[3] Under the joint action test, the Supreme Court has held that a "willful participant in joint activity with the State or its agents" is a state actor. *See United States v. Price*, 383 U.S. 787, 794 (1966). At least three threads of cases have arisen under this doctrine. First, a private citizen can be held liable when he or she conspires with a state actor to deprive the plaintiff of his constitutional rights. *See id.*; *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970). Second, the state can make an active choice to partner with a private entity in a way that can impart liability. *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357–58 (1974); *Gilmore v. City of Montgomery*, 417 U.S. 556, 574 (1974); *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961). Last, a private citizen can take up the mantle of sovereignty through the *ex parte* use of civil or criminal processes. *See Lugar*, 457 U.S. at 924; *Bendiburg v. Dempsey*, 909 F.2d 463, 469 (11th Cir. 1990).

The Supreme Court has cautioned that this analysis will be heavily fact specific. *See Burton*, 365 U.S. at 722 ("Only by sifting

---

[3] Charles additionally argues that the officers "encouraged" Leckie, pointing to their *deposition* testimony expressing appreciation for Leckie stepping in. Charles does not identify any encouragement that existed at the time of the incident. Later expressions of appreciation are insufficient to satisfy the state compulsion test. Thus, only Charles's joint action argument deserves further analysis.

facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance."). Because the joint action test applies to a broad array of factual scenarios, some cases nominally interpreting this test have used language that is unhelpful in its application to other scenarios. For example, the Supreme Court has said that private liability will attach where the state "so far insinuated itself into a position of interdependence with the [private entity] that it was a joint participant in the enterprise." *Jackson*, 419 U.S. at 357–58. *Jackson* said that the state and private entity must form a "symbiotic relationship." *Id.* at 357. *Jackson*, however, involved a state's ongoing relationship with a utility company. It is not clear how Leckie would become part of a "symbiotic relationship" or fall into a "position of interdependence" with the State of Georgia. This "rule language" cited by the parties suffers from a lack of context.

The test also suffers from a lack of clarity when it comes to a conspiracy requirement. The district court cited *Price* for the proposition that a conspiracy is *always* needed for private citizen liability. *Price*, however, only says that a conspiracy is sufficient, not that it is necessary. 383 U.S. at 794. In at least two circuits, conspiracy has been described as one of many alternatives. *See Hoai v. Vo*, 935 F.2d 308, 313 (D.C. Cir. 1991); *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989). In the Seventh Circuit, however, private liability is almost impossible without a conspiracy. *See Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002) (explaining that private liability is only permissible when

there is a conspiracy or when private citizens are "deputized" to help enforce the law). We have admonished a district court for requiring direct proof of a conspiracy, saying that "nothing more than an 'understanding' and 'willful participation' between private and state defendants is necessary to show the kind of joint action that will subject private parties to § 1983 liability." *Bendiburg*, 909 F.2d at 469.

This confusion stems from an attempt to apply broad rule language to disparate factual situations under the joint action test. The three lines of Supreme Court precedent under this test—conspiracy, state-prompted partnership, and individual-prompted use of state authority—are distinct and require different kinds of proof. For example, an individual's *ex parte* use of state procedures does not require a conspiracy with state authorities. Instead, the "understanding" is proven through the offering of the procedures and the intentional use of the procedures. *See, e.g., id.* A state's ongoing partnership with a private entity is itself proof of an "understanding." Where *Jackson* and *Lugar* do not reach, however, additional proof of conspiracy is needed in order to show the requisite "understanding."

When a private citizen steps in to render brief, *ad hoc* assistance to a police officer, *Jackson* and *Lugar* are immediately distinguishable. The citizen clearly does not make use of state processes against his personal enemy, and the state is clearly not reaching out to the citizen to form a partnership. Because no other form of

citizen-state collaboration applies, the only thread of precedent that could cover the private citizen's actions is the conspiracy thread.

We need not determine what the specifics of the conspiracy must be, because it is clear in this case that there is no evidence of a conspiracy whatsoever. The communication between Leckie and Deputy Thacker consisted only of Leckie asking: "Sir, can you get a cuff on him?" This is not an agreement between the two, and it is certainly distinguishable from the conspiracies examined by the Supreme Court in *Price* and *Adickes*.

The Seventh Circuit reached the same conclusion under similar facts in *Proffitt v. Ridgeway*. In *Proffitt*, a police officer accepted a bystander's offer to help restrain an arrestee. 279 F.3d at 505. Our sister circuit held that "the rendering of brief, ad hoc assistance" did not transform a bystander into a state actor. *Id.* at 508.

We hold that a civilian's rendering of brief, *ad hoc* assistance to a law enforcement officer is not state action, absent proof of a conspiracy to violate the constitutional rights of another. Summary judgment in favor of Leckie was therefore proper.

## IV

We turn next to the question of qualified immunity.

Government officials acting in their discretionary duties are entitled to qualified immunity from individual capacity suits. *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir. 2002). Qualified immunity protects them from suit unless they violate "clearly established statutory or constitutional rights of which a reasonable

person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"To establish the defense of qualified immunity, the burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority." *Harbert Int'l, Inc. v. James*, 157 F. 3d 1271, 1281 (11th Cir. 1998). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Lee*, 284 F.3d at 1194).

Whether governmental officials are entitled to qualified immunity at summary judgment entails a two-part inquiry. *Dukes v. Deaton*, 852 F.3d 1035, 1042 (11th Cir. 2017). "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable officer would understand that what he is doing' is unlawful." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope*, 536

U.S. at 739 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The essential question here is whether the officer had "fair warning" that his actions were unconstitutional.  *See Willingham v. Loughnan*, 321 F.3d 1299, 1301 (11th Cir. 2003).

This analysis is primarily conducted by looking at the binding case law of the Supreme Court and this circuit.  *See generally al-Kidd*, 563 U.S. at 741; *see also Reichle* , 566 U.S. at 664  ("[E]xisting precedent must have placed the statutory or constitutional question beyond debate." (quoting *al-Kidd*, 563 U.S. at 741)); *Stephens v. DeGiovanni*, 852 F.3d 1298, 1315–16 (11th Cir. 2017) (holding that "relevant case law" is the default way to determine qualified immunity, but qualified immunity can still be defeated under the "narrow exception" where the actions were obviously unconstitutional).

It is undisputed that Deputy Thacker and Deputy Brantley were acting within their discretionary authority.  Therefore, the issue turns to whether Charles can carry his burden to establish that they violated his constitutional rights, and whether, in light of existing precedent, those violations should have been apparent to them respectively.

### A

As to Deputy Thacker, Charles only argues that Thacker's "tackle" was a constitutional violation.  Charles argues that this tackle was excessive force in violation of the Fourth Amendment.

The Fourth Amendment protects against excessive force in the arrest context. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). A "reasonableness" standard is used to judge the actions of the officer: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (citation omitted). "In determining the reasonableness of the force applied, we look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009). The court must look at the "totality of the circumstances" in assessing the manner of arrest. *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). The Supreme Court has analyzed a non-exhaustive list of factors, such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Determining whether an officer's use of force is unconstitutionally excessive involves two steps. First, we ask whether the specific kind of force is categorically unconstitutional. *See Hope*,

536 U.S. at 745–46.  Second, if the kind of force is not categorically unconstitutional, we then ask, weighing the *Graham* factors, whether the amount of force was excessive.

We have never held that a tackle is a categorically unconstitutional kind of force.[4]  And for good reason:  It is obvious that a police office will be authorized to tackle an arrestee under some circumstances.  The only question here is whether, under the circumstances, Deputy Thacker's tackle was an excessive use of force.  Assessing the *Graham* factors, we cannot say that it was.

Charles cites *Stephens v. DeGiovanni*, 852 F.3d 1298 (11th Cir. 2017), as an example where an officer who threw an individual to the ground was not entitled to qualified immunity.  The facts of *Stephens*, however, are not comparable to the facts here.  We noted in *Stephens* that the arrestee was compliant, had committed no crime, had not made any threatening or erratic actions, and did not attempt to flee from the scene.  None of the *Graham* factors supported any use of force.  We therefore concluded that "[q]ualified immunity is not appropriate when the *Graham* analysis yields an answer that is clear beyond all doubt."  *Id.* at 1324 (quoting *Lee*, 284 F.3d at 1200).  The facts of this case are diametrically opposed to such a clear answer.

---

[4] *Cf. Durruthy v. Pastor*, 351 F.3d 1080, 1085 (11th Cir. 2003) (Two officers who "pulled [the arrestee] onto the ground, while struggling to pin his arms behind him and handcuff him," were entitled to qualified immunity.)

To be sure, the *Graham* factors do not point unwaveringly in Deputy Thacker's favor. Charles's pre-tackle behavior constituted active resistance and a sure attempt to resist arrest, but he never made a clear move to flee the scene. Charles, in twisting his arms away from Deputy Thacker's reach, knocked Thacker's sunglasses from his forehead, but he did not otherwise direct any violent behavior toward Deputy Thacker before the tackle. Nevertheless, at the time of the tackle, Charles did have an outstanding warrant for his arrest. Regardless of the seriousness of the underlying offense, an officer on duty may use reasonable force to effectuate a lawful arrest.

The situation certainly entailed a risk of danger to Deputy Thacker and to Charles. Even when taking the evidence in the light most favorable to Charles, the situation that night was tense. It was after midnight, Deputy Thacker had no backup on the scene, and he had detained a car full of young people, presumably friends of Charles, at a fairly busy gas station. Charles was loudly yelling and acting erratically, and the occupants of the vehicle were getting agitated, leaning out of and eventually leaving the vehicle. By the time Deputy Thacker tackled Charles, Charles had ignored at least thirteen commands from Thacker and had gone nearly a minute without complying. Thacker tried multiple times to pull Charles's hands behind his back, but Charles maneuvered his body and arms away from Thacker in order to prevent handcuffing. Deputy Thacker had so far acted reasonably, but continuing the arrest in

this fashion was not an option, thanks to Charles's unabated resistance.

In order for Deputy Thacker to stabilize the situation, he had to immobilize and handcuff Charles by using an increased level of force. But instead of using a weapon, such as a taser, to achieve these ends, and instead of striking Charles with, say, his flashlight or fist, Thacker chose in the heat of the moment to tackle Charles. Considering all the circumstances of the situation with which Thacker was faced, a tackle was among the least forceful ways to advance the arrest and gain control of the situation.

The evidence of injury confirms that Deputy Thacker did not use excessive force. A plaintiff who suffers only *de minimis* injury does not necessarily lack a claim for excessive force under § 1983. *Stephens*, 852 F.3d at 1328 n.33; *Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014). However, the resulting injuries can be evidence of the kind or degree of force that was used by the officer. *See Crocker v. Beatty*, 995 F.3d 1232, 1251 (11th Cir. 2021). The injuries attributable to Deputy Thacker's tackle were minor. The small scrapes, bumps, and bruises suffered from the tackle are entirely consistent with a routine takedown. When Charles is picked up off the pavement and placed into Deputy Thacker's patrol car, no blood can be seen on the pavement, nor is there evidence in the record that any eyewitness saw blood on the scene before Charles was placed in the patrol car. The evidence all tends to show that there was no especially violent character to Thacker's tackle.

Weighing the factors identified in *Graham* and reflecting on the totality of the circumstances, we cannot say that the tackle was unreasonable. Nor did the law of this circuit clearly establish the unreasonableness of the Deputy Thacker's actions at the time of Charles's arrest. Thus, Deputy Thacker is entitled to qualified immunity.

**B**

As to Deputy Brantley, Charles only identifies Brantley's use of a taser as a potential constitutional violation. Like the tackle, Charles argues that this taser use was excessive force in violation of the Fourth Amendment.

The use of a taser is not categorically unconstitutional. We have found that the use of a taser can be appropriate in a wide array of situations. *See Hoyt v. Cooks*, 672 F.3d 972, 980 (11th Cir. 2012); *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004). The only question is whether Deputy Brantley's use of a taser constituted excessive force under the totality of the circumstances. To lose qualified immunity, the circumstances must show that the force was clearly excessive. *See Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) ("Because [the Fourth Amendment's use-of-force] standard establishes no bright line, qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in [the same] position to conclude the force was unlawful."), *modified on other grounds*, 14 F.3d 583 (11th Cir. 1994).

Applying the *Graham* factors to the evidence in the light most favorable to Charles, we find that Deputy Brantley's use of the taser was not clearly excessive under the circumstances. Two crimes were at issue by the time the taser was deployed: Charles had an outstanding warrant for his arrest, and he had already begun his active and loud obstruction of the arrest. As established by his obstruction conviction, Charles was "offering or doing violence" to one of the officers. Further, Charles was actively resisting when Brantley arrived on the scene. Charles was not tased until five minutes and six seconds after he had first been given an order by Deputy Thacker. In those five minutes, Charles ignored twenty-one commands from the officers and was warned nine times that a taser would be used. His resistance was active resistance because he actively navigated his arms and body away from Deputy Thacker in order to avoid being properly handcuffed. By pulling his arms and body away from the grasp of Deputy Thacker, Charles led the pair from one side of the patrol car to the other and actively evaded being handcuffed in the back until Deputy Brantley arrived and tased him. Charles actively resisted by screaming at Thacker and by pushing his body off the pavement three times after he was ordered to stay down. The undisputed video evidence clearly shows this resistance.

The *Graham* factors therefore authorize use of force. Under the totality of the circumstances, we cannot say that Deputy Brantley's use of a taser only once, for not more than five seconds, in "stun" mode, was excessive. Because this instance of taser use

cannot be described as excessive, it logically could not have been "clearly established" or "apparent" to Deputy Brantley that use of the taser was excessive. Deputy Brantley is therefore entitled to qualified immunity.

Charles argues that a non-*Graham* factor should be injected into our qualified immunity analysis. Specifically, Charles cites *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005), for the proposition that a violation of department policy can defeat qualified immunity. Department policy in this case directs that a taser "should not be used against persons displaying passive resistance," and Charles argues that Deputy Brantley violated this policy.

In *Mercado*, the officers responded to a report of attempted suicide. They found Mercado with a knife in his hand and a cord wrapped around his neck. The officers ordered Mercado to drop the knife but failed to warn him that force would be used if he did not comply. *Id.* at 1154. Fifteen to thirty seconds later, the officers shot Mercado with a Sage Launcher, a plastic munition designed to bruise the target. The officers fired the Sage Launcher twice, with one of the two shots hitting Mercado in the head, causing a skull fracture and brain injuries. *Id.* at 1154–55. We held that the officers had violated clearly established law.

In *Mercado*, we noted that police department policy restricted use of a Sage Launcher such that a shot to the head should only be taken in deadly force situations. *Id.* at 1155. Charles argues that this violation of department policy is comparable to Deputy Brantley's violation of department policy regarding taser

use, and therefore Deputy Brantley's actions also violate clearly established law.

We need not determine whether Deputy Brantley in fact violated the policy at issue in this case, though it is plain that Charles was actively resisting for more than five minutes. In *Mercado*, the violation of department policy did not govern our *Graham* analysis. After all, the ultimate question was whether the officers violated the Fourth Amendment to the United States Constitution, not whether they violated a department policy. In *Mercado*, none of the *Graham* factors weighed in favor of the use of force. Attempted suicide was not a crime under Florida law, Mercado had not demonstrated a flight risk and did not pose a danger to the officers, and he had failed to comply for only a few seconds. On those facts, we were compelled to conclude that the use of force was unreasonable.

We found the department policy useful in *Mercado* for a different reason. Once we determined that the use of force was excessive, the next question in the qualified immunity analysis asks whether the officer violated clearly established law. We had to determine whether the officers had "fair warning" that their actions were unconstitutional. *See Willingham*, 321 F.3d at 1301. A police handbook that directs an officer to avoid a particular unconstitutional activity can be evidence that the officer was so warned. In *Mercado*, for example, the restriction against firing a Sage Launcher at the head of a non-threatening suspect was tantamount

to a codification of the general constitutional principle that deadly force cannot be used in non-deadly-force situations.

Because we find that Deputy Brantley did not engage in unconstitutional excessive force, we need not consider the department policy.

## V

Finally, we turn to Charles's claim against Sheriff Jeff Johnson under the Rehabilitation Act.

The Rehabilitation Act says that no disabled person "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794.[5]  In order to recover under the Rehabilitation Act, a plaintiff must establish: "(1) that he is a qualified individual with a disability, (2) that he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity or otherwise discriminated against by such entity, (3) by reason of such disability." *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001) (alterations adopted) (quotation marks omitted) (quoting 42 U.S.C. § 12132).  Of course, "the duty to

---

[5] Claims under the Rehabilitation Act are generally governed by the same standards used in Americans with Disabilities Act cases. *See* 42 U.S.C. § 12101 *et seq.*; *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).  Thus, cases decided under one are precedent under the other. *See Cash*, 231 F.3d at 1305 n.2.

provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999). Additionally, a plaintiff seeking compensatory damages must show that the lack of accommodation was due to "intentional discrimination or bad faith," *Wood v. President of Spring Hill Coll.*, 978 F.2d 1214, 1219 (11th Cir. 1992), and must show that injury resulted from the lack of accommodation, *see Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1088 (11th Cir. 2007).

Charles's claim fails at the first element. He does not demonstrate that he was disabled within the meaning of the Rehabilitation Act.

For Rehabilitation Act purposes, a "disability" is "a physical or mental impairment that substantially limits one or more major life activities." *See* 29 U.S.C. § 705(9)(B) (cross-referencing 42 U.S.C. § 12102). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Charles does not identify the major life activity that his impairments interfere with. He does not explain how his bipolar disorder or panic attacks would substantially limit such a life activity. The identification of a major life activity is a necessary step in proving a disability. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). Instead of providing any explanation or citation to the record,

Charles simply cites three cases to support bipolar disorder as a disability and two to support panic attacks as a disability.

To support bipolar disorder as a disability, Charles cites *Kassa v. Synovus Fin. Corp.*, 800 F. App'x 804 (11th Cir. 2020), *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100 (1st Cir. 2005), and *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999). Neither *Kassa* nor *Tobin* held that bipolar disorder is a qualifying disability because neither decided the issue at all. *See Kassa*, 800 F. App'x at 807 ("For purposes of summary judgment, the district court assumed that Plaintiff was both disabled and was a qualified individual. Thus, only the third factor is at issue in this appeal."); *Tobin*, 433 F.3d at 105 ("[I]t is undisputed that Tobin has established a prima facie case . . . ."). As for *Taylor*, the case does say that bipolar disorder *could* be a qualifying disability. However, *Taylor* instructs that this is a fact-specific inquiry, and that bipolar disorder is not automatically qualifying. 184 F.3d at 302. All three cases are, of course, distinguishable simply because the plaintiffs in those cases identified a major life activity that was impaired. Charles does not.

To support panic attacks as a disability, Charles cites *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144 (2d Cir. 1998), and *Zirpel v. Toshiba Am. Info. Sys., Inc.*, 111 F.3d 80 (8th Cir. 1997). Instead of holding that panic attacks are a qualifying disability, *Reeves* held that the plaintiff had *failed* to demonstrate a disability: "We hold that the activity described by plaintiff . . . does not constitute a major life activity within the meaning of the ADA, and that plaintiff therefore has not demonstrated that he is disabled for

20-12393            Opinion of the Court                31

purposes of that statute." 140 F.3d at 147; *see also id.* at 151. *Reeves* reiterates that the identification of a major life activity is a critical step in making out a Rehabilitation Act case.

Charles's second case, *Zirpel*, is unhelpful for the same reason. In *Zirpel*, the plaintiff also failed to prove a limitation on her major life activities. *See* 111 F.3d at 81 ("Obviously, Toshiba cannot have violated Zirpel's rights under the ADA unless Zirpel is disabled. Zirpel suffers from a mental impairment, panic disorder, but Zirpel failed to create a triable dispute about whether her disorder substantially limits any of her major life activities. Although Zirpel's ability to breathe and speak is hampered during an actual panic attack, Zirpel admits her panic disorder does not usually limit her activities." (citations omitted)).

Charles omits this critical step. His Rehabilitation Act claim therefore fails, and summary judgment for the Sheriff was appropriate. We have no occasion to consider the other elements of a Rehabilitation Act claim.

## VI

We **AFFIRM** the summary judgment in favor of Appellees.